**In re Ben Jean PREVOT and Arielle Dominique Prevot, the minor children.**

**Jean–Claude PREVOT, Petitioner,**

**v.**

**Debra Moseman PREVOT, Respondent.**

**No. Misc 93–61–Ml.**

United States District Court, W.D. Tennessee, Western Division.

June 15, 1994.

Caren B. Fogelman, Memphis, TN, for petitioner.

David W. Camp, Memphis, TN, for respondent.

## MEMORANDUM AND ORDER

McCALLA, District Judge.

This action is before the Court on a petition filed by Jean–Claude Prevot pursuant to

the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq.* (the "Act"), and the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 (the "Convention"), which became effective in the United States on July 1, 1988.[1] Petitioner, the natural father of the children, is a French citizen and seeks return of the children to France. At the time of the filing of the petition, the children had recently been brought to the United States by their mother and were living in Memphis, Tennessee. Their mother, the respondent, is an American citizen.

Hearings were held in this matter on Tuesday, December 28, 1993, and Thursday, January 27, 1994. The Court, having considered the oral and written arguments of counsel, as well as the relevant evidence, including the testimony of witnesses, concludes that the relief requested by the petitioner must be GRANTED for the reasons set forth hereinafter.

## FINDINGS OF FACT

Mr. and Mrs. Prevot were married in Texas in November of 1988. Shortly after their marriage, Mrs. Prevot became aware of a criminal investigation and/or a pending criminal action involving her husband. This action ultimately resulted in Mr. Prevot pleading guilty in December of 1988 to theft of property of the value of $20,000 or more, a second degree felony, in Texas. Mr. Prevot was placed on probation for a period of ten years and ordered to pay restitution in the amount of $45,000, payable in monthly installments of $380 per month. As a condition of his probation, Mr. Prevot was ordered to remain in Dallas County, Texas, and was required to obtain written permission before traveling outside Dallas County.

Mr. and Mrs. Prevot decided to explore the possibility of opening a French restaurant in Memphis, Tennessee. Permission was obtained from the Dallas court,[2] and they moved to Memphis in February of 1989. The couples' first child, Ben Claude, was born in April, 1989. A restaurant was opened and named after their son (i.e., Ben's). Mr. Prevot was the chef at Ben's while Mrs. Prevot was responsible for all other aspects of the business, including keeping the books and paying the bills. Sometime after Ben's opened, Mrs. Prevot testified that she discovered that Mr. Prevot owed back taxes of approximately $125,000 to the Internal Revenue Service.[3] Mrs. Prevot testified that she contacted the IRS and began making payments to avoid foreclosure. About this time Mr. Prevot also declared bankruptcy.

According to Mrs. Prevot, her husband subsequently approached her and said that he "felt caged in" by his obligations, i.e., the restitution payments of $380 per month, the back taxes, and his meetings with the probation officer in Memphis. Mrs. Prevot testified that her husband first suggested that if they moved to France, his native country, they could escape these obligations. For whatever reason, the decision was ultimately made to move to France. Because of his felony conviction, however, Mr. Prevot no longer had a passport. The family, therefore, went to Canada and stayed there approximately five weeks while Mr. Prevot obtained a passport through the French embassy in Canada.[4] Two restitution payments were paid in advance so that he would not be in financial violation of the conditions of his

---

1. Both the United States and France are signatories to the Convention.

2. As a condition of probation, petitioner was also required to report to a probation officer on the first Wednesday of each month, and to notify the probation officer twenty-four hours prior to a change in his home or employment address. Respondent testified that she and the petitioner moved to Memphis before petitioner actually obtained permission from the Dallas court to move, but that petitioner later successfully obtained permission to live in Memphis. Petitioner's probation was transferred to Memphis where he met with a probation officer and paid his monthly restitution.

3. Respondent testified that when she arrived early one morning she found a notice on the door from the IRS. Respondent also testified that these taxes were owed from a restaurant petitioner had previously operated in Texas.

4. The couples' second child, Arielle Dominique, was born in Memphis before they left for Canada.

parole while he was in Canada attempting to obtain a passport.[5]

Mr. and Mrs. Prevot and their two children arrived in France in June, 1991. Upon their arrival, the family traveled the country looking for a place to open a restaurant, ultimately settling in the city of Mougins. Ben was enrolled in a local school and adjusted to life in his new community well. His sister, who was too young to attend school, stayed at home. Once again, Mr. and Mrs. Prevot opened a restaurant and, once again, Mr. Prevot was the chef and Mrs. Prevot was the hostess and manager. Because Mrs. Prevot was not completely fluent in French, however, this arrangement did not work as it had in the United States and ultimately Mrs. Prevot became less involved in restaurant and cooking school operations.[6]

Mrs. Prevot testified that she and Mr. Prevot began to argue in November of 1992 and that, up to that time, she and Mr. Prevot had not experienced marital difficulties and that Mr. Prevot was a good father. These arguments stemmed from the family's financial situation and from Mr. Prevot's refusal to move the family from the trailer into an apartment or flat. There was testimony by Mrs. Prevot that during this period Mr. Prevot became physically and verbally abusive. There was testimony by Mr. Prevot that Mrs. Prevot began drinking excessively and was involved in one or more alcohol related traffic accidents.

Mrs. Prevot testified that during an argument in March of 1993, she first informed her husband that she wanted to return to the United States. Mrs. Prevot testified that as early as December of 1992 she was no longer able to locate the children's passports and her passport, and that Mr. Prevot become evasive and/or abusive when asked about the location of the passports. After another altercation between the parties in April of 1993, Mrs. Prevot testified that Mr. Prevot told her the passports were in the possession of an attorney.

In May of 1993, the parties were involved in yet another domestic dispute. Mrs. Prevot testified that Mr. Prevot came home late one evening without Ben. When she questioned him about the location of their son, Mr. Prevot refused to tell her and a fight ensued between the two. Neighbors apparently called the police. Mrs. Prevot testified that the police made Mr. Prevot return Ben to the home the following afternoon. Mrs. Prevot further testified that after this incident her husband moved out of the trailer and lived in the basement of their restaurant, returning occasionally to bring food to the trailer. Mr. Prevot denied that the parties separated or that he moved out of the trailer. When pressed by Mrs. Prevot's counsel, he did state that "once upon a time" he would spend the night at the restaurant.

Several more incidents took place between the parties during the summer of 1993 and

---

5. With regard to the petitioner's felony conviction in Dallas, the parties submitted the following stipulation:

   1. On February 6, 1992, a warrant was issued by the 195th Judicial District Court of Dallas County, Texas for Jean–Claude Prevot due to the violation of his probation.

   2. This warrant was issued due to his failure to report and pay probation and restitution fees. His last payment of $380 was in May of 1991, there is an outstanding balance of approximately $38,000.

   3. His probation required him to make monthly payments of $380 and he had been making these payments up until May of 1991.

   4. There has been no prior violation of his parole before this point.

   5. The probation officer in Dallas, Ann Graham, has stated that they would not pursue this warrant outside of the country.

   6. The probation officer, Ann Graham, has stated that Mr. Prevot may be unaware that a warrant has been issued since he was never served with the warrant.

6. Mrs. Prevot testified extensively regarding their alleged living conditions while in France. The family lived in a 36 foot trailer located in a campground or trailer park. The trailer had two rooms, a back room where the children slept with the remainder of the trailer containing the kitchen and a fold out bed where the petitioner and respondent slept. Mr. Prevot erected a tent or canopy on the side of the trailer where the children would play when the weather permitted. Mrs. Prevot testified that the trailer's plumbing system overflowed, that there was no lock on the back door of the trailer located in the children's room, that several windows in the trailer were broken, and that the refrigerator was broken for a number of months. There was also proof, however, that the restaurant operated by Mr. and Mrs. Prevot contained living facilities in its basement (facilities for changing clothes, a place for the children to stay, a television, etc.).

Mrs. Prevot made a decision to return to the United States with the children. After filing a stolen passport report, Mrs. Prevot was able, without the knowledge of her husband, to obtain passports for herself and the children. On August 21, 1993, Mrs. Prevot took the children, drove to Italy, and flew to New York. Mrs. Prevot left France without telling Mr. Prevot she was leaving with the children.

## CONCLUSIONS OF LAW

Although the International Child Abduction Remedies Act has been in effect in this country since 1988, cases interpreting its provisions are relatively scarce. The Sixth Circuit, however, has addressed the Act in length. *Friedrich v. Friedrich,* 983 F.2d 1396 (6th Cir.1993).

In *Friedrich,* the Sixth Circuit recognized that the purpose of the Act is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." *Id.* at 1399–1400 (*quoting* Hague Convention, Preamble). Under the Convention and pursuant to section 2(b)(4) of the Act, the district court has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim. *Id.* at 1400. "Wrongful removal" is a legal term strictly defined in the Convention, and does not require an ad hoc determination or a balancing of the equities. *Id.* "Such action by a court would be contrary to a primary purpose of the Convention: to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." *Id.*

The Convention states that removal of a child from one country to another is wrongful when:

> (*a*) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

> (*b*) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention. The rights of custody mentioned in subparagraph *a* above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of agreement having legal effect under the law of that state.

Hague Convention, Article 3.

The Sixth Circuit, in *Friedrich,* set forth the analysis to be followed under the Act:

> Under the Act, [the petitioner] has the burden of showing by a preponderance of the evidence that the removal was wrongful. 42 U.S.C. § 11603(e)(1). If [petitioner] meets his burden, the burden shifts to [the respondent] to show 1) by clear and convincing evidence that there is grave risk that the return of the child would expose the child to physical or psychological harm; Hague Convention, Article 13 *b,* 42 U.S.C. § 11603(e)(2)(A); 2) by clear and convincing evidence that the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms"; Hague Convention, Article 20, 42 U.S.C. § 11603(e)(2)(A); 3) by a preponderance of the evidence that the proceeding was commenced more than one year after the abduction and the child has become settled in its new environment; Hague Convention, Article 12, 42 U.S.C. 11603(e)(2)(B); or 4) by a preponderance of the evidence that [the petitioner] was not actually exercising the custody right at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; Hague Convention, Article 13 *a,* 42 U.S.C. § 11603(e)(2)(B).

> Therefore, as a threshold matter, [the petitioner] must prove by a preponderance of the evidence that 1) [the respondent] removed [the child] from his "habitual residence," and 2) [the petitioner] was exercising his parental rights over [the child] at the time of removal, or that he would have exercised his rights but for the removal, under the law of the state of [the child's]

habitual residence. If [the petitioner] meets this burden, [the respondent] may fall back on one of the four affirmative defenses.

*Friedrich,* 983 F.2d at 1400.

## I.

### A.

■ As noted in *Friedrich,* the term "habitual residence" is not defined by the Convention. Courts in this country have looked to the British courts which have provided the most complete analysis and have urged other courts to "resist the temptation to develop detailed and restrictive rules as to habitual residence, which might make it as technical a term of art as common law domicile. The facts and circumstances of each case should continue to be assessed without resort to presumptions or presuppositions." *Friedrich,* at 1401 (*quoting In re Bates,* No. CA 122.–89, High Court of Justice, Family Div'n Ct., Royal Court of Justice, United Kingdom (1989)). The Sixth Circuit, in *Friedrich,* went on to state that in determining habitual residence, "the court must focus on the child, not the parents, and examine past experience, not future intentions," and that "habitual residence pertains to customary residence prior to the removal." *Id.* at 1401.

In the case at bar, Mr. Prevot has established by a preponderance of the evidence that the Prevot children were habitual residents of France when they were removed by Mrs. Prevot to the United States. Sometime during the spring of 1991, Mr. and Mrs. Prevot made the conscious decision to relocate in France, arriving there in the summer of 1991. The family lived there for more than two years before Mrs. Prevot brought them back with her to the United States. Ben, the oldest child, was enrolled in school and was popular with his classmates. The younger child, Arielle, was similarly well adjusted. The family established a business with the full intent that France was to be their permanent home. Mr. Prevot's extended family resided in France and the children became a part of that family. Clearly, the children were habitual residents [7] of France as that term is defined in *Friedrich.*

■ Mrs. Prevot argues that the children's residence was "coerced" in that Mr. Prevot took her and the children's passports to prevent them from leaving the country. In support thereof, Mrs. Prevot cites *In re Ponath,* 829 F.Supp. 363, 368 (D.Utah 1993), which held that "coerced residence is not habitual residence within the meaning of the Hague Convention." *Ponath,* however, is clearly distinguishable from the case at bar. There, the husband (a German citizen) and wife (an American citizen) left the United States with their son (born in Utah) for the express purpose of "visiting [the husband's] family" in Germany. The visit was to be an extended one and the couple anticipated returning after three to six months. After arriving in Germany, the husband obtained employment and the parties apparently began to disagree about their length of stay in Germany, with the husband preventing the wife from returning to the United States by means of verbal, emotional and physical abuse.

In the case at bar, the parties clearly went to France with the intention of settling there and opening a restaurant. Moreover, the parties lived in France for approximately one year before they began experiencing marital difficulties. It was only after these events that there is any indication that Mr. Prevot may have held the family's passports. Clearly, both parents jointly agreed to move to France, establish a business there, and raise their children. This is not a situation where Mr. Prevot created "habitual residence" by forcing Mrs. Prevot (and the children) to stay in France for a period of time sufficient to establish residency.[8] In this case, residency was created over a period of time well before

---

**7.** At the hearing on December 28, 1993, counsel for Mrs. Prevot virtually conceded that the children were habitual residents of France.

**8.** For an example of a parent absconding with a child in an attempt to create residency, see *Meredith v. Meredith,* 759 F.Supp. 1432, 1435 (D.Ariz. 1991).

the parties began experiencing marital difficulties.[9]

### B.

█ The record also supports the conclusion that Mr. Prevot was exercising his custodial rights at the time of the children's removal. Although Mrs. Prevot testified that Mr. Prevot moved out of the family's trailer in May of 1993, Mrs. Prevot also testified that her husband returned every few days to bring food to the family. Mr. Prevot, on the other hand, denied that he and Mrs. Prevot separated or that he moved out of the trailer. The court, however, need not resolve this discrepancy. Even Mrs. Prevot's testimony establishes that Mr. Prevot continued to be involved in the lives of his children and to provide for them.

Mrs. Prevot testified that on one occasion after Mr. Prevot allegedly moved out, she was at the restaurant with the children when she and her husband got into yet another argument. On this occasion, Mrs. Prevot testified that Mr. Prevot took the children under his arms and told her to leave the restaurant. There is no credible testimony, even from Mrs. Prevot, that her husband abandoned the family or failed to exercise his custodial rights while the children were in France. Moreover, his testimony fully supports the proposition that, until his wife left with the children, he continued to be both a father and provider for his children.

Accordingly, the court holds that Mr. Prevot has carried his burden of proving that Mrs. Prevot removed the children from their habitual residence and that he was exercising his parental custody rights over the children at the time of removal.

### II.

█ Mrs. Prevot argues that one of the four affirmative defenses exists in this case—there is grave risk that return of the children would expose them to physical or psychological harm. 42 U.S.C. § 11603(e)(2)(A). In support thereof, Mrs. Prevot relies upon the testimony of Dr. Allen Overton Battle, a clinical psychologist at the University of Tennessee, who was called by counsel for respondent to testify regarding his examination of the Prevot children on January 25, 1994.

Dr. Battle testified generally regarding his examination of Ben and described Ben as being preoccupied with safety. Although Dr. Battle stated that "something has happened to Ben that has profoundly affected him," he was unable to state with certainty the cause or source of the trauma and/or stress. When asked to give his opinion regarding the return of Ben to his father in France, Dr. Battle opined that it would cause grave psychological harm to Ben.[10] Because of her young age, Dr. Battle was unable to give an opinion regarding the possibility of psychological harm to Arielle if returned to her father in France.

The testimony of Dr. Battle does not establish *by clear and convincing evidence* (the standard required by the Act) a grave risk of physical or psychological harm in the event that the children are returned to France. On both direct and cross examination, Dr. Battle stated that children of the age of Ben and Arielle are highly suggestible and that identifying "grave risks of psychological harm" involves line drawing and predicting the future. Dr. Battle further stated that when in doubt, he takes a conservative approach, erring on the side of that which appears to be safest for the children. Moreover, Dr. Battle stated that he obtained much of his initial knowledge of this case from the history as told by Mrs. Prevot, without obtaining any information from Mr. Prevot. Dr. Battle further testified that it is important to view the children with their father, but that he was unable to do so in this case. Although the court finds Dr. Battle to be a credible witness, his testimony, taken as a whole, does not establish by clear and convincing evidence that returning the chil-

---

**9.** *Friedrich* discusses habitual residency in terms of "geography and the passage of time...." *Friedrich*, 983 F.2d at 1402.

**10.** As to Ben, Dr. Battle's testimony, while balanced and professional, appeared reluctant. It should be noted that there was no credible proof that either child was at any risk of physical harm and it was generally conceded that Mr. Prevot has been a good and loving father.

dren[11] to their father in France would create a grave risk of psychological harm.

### III.

Mrs. Prevot also argues that the equitable doctrine of unclean hands should preclude the relief sought by the Mr. Prevot. Mrs. Prevot contends that her husband, who is a fleeing felon from Texas, should not be allowed to use a court system from which he fled to obtain the return of his children. Mr. Prevot seeks relief, however, under a treaty (the Hague Convention) and the International Child Abduction Act passed by Congress to implement it. The relief provided by the Act is simply not subject to traditional equitable defenses. Moreover, one requirement of the defense of unclean hands is that the alleged wrongful conduct be directly related to the matter in litigation. *Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.*, 562 F.2d 365 (6th Cir.1977). Mr. Prevot's initial flight from the United States and violation of the terms of his probation is simply unrelated to his request that the children be returned to the country of their habitual residence as provided by the Act. In any event, Mrs. Prevot aided her husband in his initial flight from the United States. She cannot now attempt to use the activity in which she voluntarily participated to disqualify her husband.

### CONCLUSION

The children Ben Jean Prevot and Arielle Dominique Prevot were wrongfully removed from France and must be returned to their father, Jean Claude Prevot, the petitioner. *Friedrich*, 983 F.2d at 1402–1403. The actions taken by Mrs. Prevot in this case constitute the exact situation that the Hague Convention was designed to remedy: "situations where one parent attempts to settle a difficult family situation, and obtain an advantage in any possible future custody struggle, by returning to the parent's native country...." *Id.* at 1402. The court may not be swayed by sympathy, nor does the court make a decision based upon which party may be the better parent or in which country there exist more favorable living conditions for the children.

Accordingly, for the foregoing reasons, the petition for the return of the children must be GRANTED.[12] The respondent, within 30 days of the entry of this order, must deliver the children to counsel for petitioner or an adult appointed by the petitioner to accompany the children on the return trip to France and to the custody of their father.

The children's passports, which are currently in the custody of the court, are, hereby, released to counsel for petitioner.

SO ORDERED.

---

11. Dr. Battle's testimony of psychological harm was only in reference to Ben. He was unable to give an opinion regarding Arielle because of her age. He did indicate, however, that separating the children would result in some "damage" to Arielle.

12. This court does not make a final custody determination regarding the Prevot children. That determination will be made by the appropriate court in France. This court simply grants petitioner the relief provided by the Act—return of the children to their country of habitual residence.