In re Ben Jean PREVOT and
Arielle Dominique Prevot,
the Minor Children.

Jean–Claude PREVOT, Petitioner–
Appellee,

v.

Debra Moseman PREVOT,
Respondent–Appellant.

Nos. 94–5854, 94–6440.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 7, 1994.

Decided July 14, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied Sept. 7, 1995.

Caren Fogelman, Evans & Petree, Memphis, TN (argued and briefed), for Jean–Claude Prevot.

David W. Camp, Dowden & Zdancewicz, Jackson, TN (argued and briefed), for Debra Moseman Prevot.

Before: JONES, SILER, and GODBOLD,* Circuit Judges.

GODBOLD, Circuit Judge.

This appeal, in No. 94–5854, is from the judgment of the district court ordering the children of Jean–Claude Prevot and Debra Moseman Prevot, who are located with the mother in Tennessee, returned to the custody of the father in France.[1] It is a case of first impression. The father brought suit under the International Child Abduction Remedies Act (ICARA), 42 U.S.C. §§ 11601–610, which is a codification of the Hague Convention on the Civil Aspects of International Child Abduction. The mother contended that, pursuant to the fugitive disentitlement doctrine, the father was disentitled to access to the district court because he is a fugitive from a criminal conviction in the United States. The district court held his fugitive status was irrelevant. We hold that because of the father's status and actions as a fugitive felon the court should have dismissed the case, and we reverse and remand with directions to dismiss. In case No. 94–6440 the district court assessed against the mother attorney's fees and the expenses of transporting the children to France. The final order in that case is reversed.

■ In 1980, 29 countries met and adopted the Convention, designed to respond to a problem of international abduction of children by their parents. Both the United States and France are signatories to the Convention. Article 1 of the Hague Convention establishes two goals: to ensure the prompt return of wrongfully removed or retained children to the Contracting State of their habitual residence, and to ensure that Contracting States mutually respect the decisions regarding custody of and access to the

children. The United States became a party to the Convention on July 1, 1988, and France is a party as well. *See* Exec. Order No. 12,648, 53 Fed.Reg. 30,637 (1988). *See generally* Hague International Child Abduction Convention: Text & Legal Analysis, 51 Fed.Reg. 10,494 (1986); H.R.Rep. No. 525, 100th Cong., 2d Sess., *reprinted in* 1988 U.S.C.C.A.N. 386. In administering ICARA the courts are to determine whether the children have been wrongfully removed from their place of habitual residence and are not to determine custody. Hague Convention, Art. 19; 42 U.S.C. § 11601(b)(4).

The father is a fugitive from the United States, the country from which he seeks return of the children to his custody in France. So far as we can determine this is the first time a fleeing felon has sought to invoke ICARA, and certainly the first effort by a fleeing felon to have children removed from the country from which he has fled and sent to him in the country where he has taken refuge. The district court, after holding Mr. Prevot's fugitive status irrelevant, granted the relief that he sought. This court of appeals granted a stay pending appeal.

## I. The Factual Background

In November 1988 Jean–Claude Prevot and Debra Moseman Prevot married. Ms. Prevot is an American citizen. Mr. Prevot is a French citizen who had resided in the United States for almost 20 years. Approximately two weeks after their marriage Mr. Prevot was arrested at their restaurant in Texas on charges of theft of property of the value of $20,000 or more, a second-degree felony. The offense occurred prior to the marriage, and Ms. Prevot had not known of it. Shortly thereafter the couple moved to Memphis, Tennessee and started a restaurant there.

In 1989 Ms. Prevot gave birth to the couple's first child, Ben. In December of 1989, in the 195th Judicial District Court of Dallas County, Texas, Mr. Prevot pleaded guilty to

---

* The Honorable John C. Godbold, Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

1. *Prevot v. Prevot*, 855 F.Supp. 915 (W.D.Tenn. 1994).

the charge of theft and was sentenced to ten years confinement plus a fine.[2] He was granted probation for ten years, with a condition that he make monthly restitution of $380, a total of some $45,000, plus a $40 per month probation officer's fee. Prevot arranged for his probation to be supervised by a Tennessee probation officer. Soon after the Memphis restaurant opened Ms. Prevot arrived at it one morning to find a notice from the Internal Revenue Service that Mr. Prevot owed $125,000 in back taxes for a restaurant he previously operated in Texas. She began making payments to IRS from restaurant revenues to avoid the closing of their new enterprise. Ms. Prevot testified, without dispute, that Mr. Prevot had put the restaurant in the name of another person to avoid responsibility for its debts. Tr. II, p. 152–53.

In February 1991 the couple's second child, Arielle, was born. Mr. Prevot told Ms. Prevot—and he acknowledges—that he felt "caged in" by his probation requirements and his payments to IRS and wanted to leave Memphis. A plan was formulated for leaving the United States and moving to France. The Texas authorities had confiscated Mr. Prevot's passport as part of his probation. App. 220; Tr. I, p. 13. To prevent the probation officer's learning of his flight he made two restitution payments to the probation officer in advance, through the May 1991 payment. This avoided triggering notice to the probation officer that he was violating terms of his probation, which required him to remain in the vicinity of Memphis and to notify his probation officer prior to any change in his home or employment address (conditions brought over from Texas with the transfer of probation supervision). The restaurant was closed. The family drove to Canada so that Mr. Prevot could obtain a passport, which he succeeded in doing through the French Embassy.[3] After three to five weeks, as soon as his passport was

received, the family departed for Europe and arrived in France in June 1991.

After travelling for several weeks the family settled down in Mougins, France and opened a new restaurant. They lived in a 36–foot trailer throughout their time in France. At the appropriate age Ben began attending school while Arielle spent her days in the trailer or at the restaurant.

The parties have stipulated that in February 1992 a warrant was issued by the Texas court for Mr. Prevot because of his violation of probation. The outstanding restitution balance was then approximately $38,000. The warrant was, of course, never served.

Beginning in November 1992 the couple began arguing. There is conflicting evidence concerning allegations of the husband's physically abusing the wife, and of excessive drinking by the wife, and of unsatisfactory living conditions in the trailer. The district court did not make findings on these issues, and we need not address them. In late 1992 or early 1993 Ms. Prevot began a search lasting several months for the passports of her and the children. She learned that Mr. Prevot had removed them from a safe at the restaurant and turned them over to an attorney and had instructed the attorney to keep them from her unless he (Mr. Prevot) was first notified. Mr. Prevot's intent in maintaining possession and control of the passports was to force Ms. Prevot and the children to remain in France. During his deposition, in answer to a question whether he knew Ms. Prevot was leaving France, he responded:

> I couldn't have any idea [that she might leave], because I had the passports and all the papers of the children in my possession.

App. 117. And he gave this testimony:

> Q. Why were they [the passports] at the lawyer's office?
>
> A. Just in case she [Ms. Prevot] would try to take them.... [W]e knew a prob-

---

2. The district court stated that Mr. Prevot pleaded guilty in December of 1988 to the Texas charge. 855 F.Supp. at 917. However, a copy of the Texas judgment shows that the plea and subsequent probation were entered December 4, 1989.

3. The record refers at times to obtaining passports—plural—in Canada, at other times passport—singular—for Mr. Prevot. The difference does not affect our decision.

lem may be coming and we just took some safety precautions.

*Id.* at 136.

Ms. Prevot testified that on May 19, 1993 Mr. Prevot moved out of the trailer, taking his belongings with him. Mr. Prevot denied moving out but admitted that he occasionally spent the night at the restaurant. During this time Ms. Prevot, through the American Consulate, filed for and obtained new passports for herself and the children, without her husband's knowledge. In August 1993 Ms. Prevot left France with Ben and Arielle, without Mr. Prevot's knowledge, and returned to Memphis, where they presently are located. In October 1993 Mr. Prevot filed suit for divorce in France. Personal service of process on Ms. Prevot was not attained, and the French court, proceeding ex parte, granted custody to Mr. Prevot pending the outcome of the present litigation. At no time since he left the United States has Mr. Prevot returned. Mr. Prevot filed his petition in the United States District Court in December 1993.

## II. District Court Proceedings

The district court held two hearings at which the mother and others testified, but the father was unwilling to come to the United States for the hearings and instead gave a deposition by long distance telephone. On cross-examination this was his explanation for his failure to come:

Q. [Counsel for Ms. Prevot.] Okay. Is there a reason why you decided not to come here personally to handle this case, instead you've chosen to do this long distance from France?

A. Because I am responsible for the restaurant, and I cannot abandon the restaurant at this time.

Q. Is it possible that you are also avoiding coming here because of the warrant for your arrest?

A. I'm not avoiding anything.

Q. Okay, you are not.

MS. FOGELMAN [Counsel for Mr. Prevot]: Jean–Claude have you been advised by an attorney possibly not to come to the United States?

THE WITNESS: I have an attorney in Dallas. And he told me that until the new development is resolved, I have no reason to come to the States.

App. 128. Dallas is the location of the court from whose conviction Mr. Prevot fled. Ms. Fogelman, his counsel in this case, is from Memphis. The restaurant in France had closed, and Mr. Prevot was using it as a site to give cooking lessons.

■ ICARA requires the petitioner to establish by a preponderance of the evidence that the child has been wrongfully removed within the meaning of the Convention. 42 U.S.C. § 11603(e)(1)(A). Wrongful removal occurs when the child is removed, in violation of the rights of custody, from the state in which the child was "habitually resident," and at the time of removal those rights must have been actually exercised. Hague Convention, Art. 3. The term "habitual resident" is not defined in ICARA or the language of the Convention. As a consequence the facts and circumstances of each case must be assessed. *Friedrich v. Friedrich,* 983 F.2d 1396, 1401 (6th Cir.1993). "The intent is for the concept [habitual residence] to remain fluid and fact based, without becoming rigid." *Levesque v. Levesque,* 816 F.Supp. 662, 666 (D.Kan.1993).

It is not disputed that Mr. Prevot and Ms. Prevot had joint custody of the children. The district court held that Mr. Prevot had carried his burdens of establishing by a preponderance of the evidence that the children were "habitual residents" of France at the time of their removal and that he was exercising his custodial rights at the time of removal.[4]

■ Under 42 U.S.C. § 11603(e)(2)(A) a respondent who opposes the return must establish that an exception set forth in Article

---

4. In *Friedrich* this court remanded with instructions that the district court make a specific inquiry into whether under the law of Germany, the place of the child's habitual residence, the husband was exercising his custodial rights at the time of the child's removal. 983 F.2d at 1402. As we discuss below, because of our disposition of the case we do not need to address the issue of whether the court erred in finding that the husband was exercising his custodial rights.

13b or 20 of the Convention applies. Article 13b provides that return need not be ordered if the person opposing return establishes that there is "a grave risk that [the children's] return would expose [the children] to physical or psychological harm or otherwise place [the children] in an intolerable situation." The exception must be proved by clear and convincing evidence, § 11,603(e)(2)(A). The court held that Ms. Prevot did not carry her burden of proving by clear and convincing evidence that there was grave risk that return would expose the children to physical or psychological harm.[5]

Ms. Prevot presented the testimony of Dr. Allen Battle, recognized as an expert by all concerned. He had examined the children, ages 4½ and 3 at the time of the examination. He testified that the older child was terrified of his father and, in the terminology of ICARA, would be subject to grave risk of psychological harm by being sent to France, and the younger child would be subject to grave risk of psychological harm if separated from her brother for an extended period. The court discounted Dr. Battle's testimony and gave as one of its reasons that the doctor had neither seen the children interacting with the father nor had an opportunity to interview the father. Thus Mr. Prevot's unwillingness to come to the United States deprived the court of expert testimony that it considered necessary.

### III.  Disentitlement of Mr. Prevot to Access to the District Court

Ms. Prevot presented to the court her contention that pursuant to its equitable powers it should deny Mr. Prevot access to the court. At the first district court hearing counsel for Ms. Prevot told the court that one of her defenses was that a fugitive seeking relief from the court must be in compliance with the laws of this country. Tr. II, p. 47. Her trial brief set out that Mr. Prevot moved her and the children to France for the purpose of circumventing the jurisdiction of

the courts, because of his failure to abide by his conditions of probation, and because of his fear of having to serve ten years in a Texas prison for violating probation. Her proposed findings submitted to the court reiterated her position. Her contentions referred to the rubric of "unclean hands," but they sufficiently brought to the court's attention the issue of whether Mr. Prevot's status and conduct barred him from access to the court. The court considered the matter and held:

> Mrs. Prevot also argues that the equitable doctrine of unclean hands should preclude the relief sought by the [sic] Mr. Prevot. *Mrs. Prevot contends that her husband, who is a fleeing felon from Texas, should not be allowed to use a court system from which he fled to obtain the return of his children.* Mr. Prevot seeks relief, however, under a treaty (the Hague Convention) and the International Child Abduction [Remedies] Act passed by Congress to implement it. *The relief provided by the Act is simply not subject to traditional equitable defenses.* Moreover, one requirement of the defense of unclean hands is that the alleged wrongful conduct be directly related to the matter in litigation. *Mr. Prevot's initial flight from the United States and violation of the terms of his probation is simply unrelated to his request that the children be returned to the country of their habitual residence as provided by the Act.* In any event, Mrs. Prevot aided her husband in his initial flight from the United States. She cannot now attempt to use the activity in which she voluntarily participated to disqualify her husband.

855 F.Supp. at 922 (emphasis added; citation omitted).

The finding that Mr. Prevot's flight is unrelated to this case was fundamental error. His status, and actions, as fugitive are central to the case. Once their significance is

---

5.  Mr. Prevot did not specifically address, nor did the district court, the second prong of Article 13b that return would "otherwise place the child[ren] in an intolerable situation."

Article 20 provides: "The return of the child under the provisions of Article 12 may be refused

if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." The district court did not address Article 20, and we need not.

recognized it is apparent that the district court abused its discretion in declining to invoke its equitable power to hold Mr. Prevot disentitled to assert his claim in a United States district court.

### A. Fugitive disentitlement—an equitable power of the court.

■ The fugitive disentitlement doctrine limits access to courts in the United States by a fugitive who has fled a criminal conviction in a court in the United States. The doctrine is long-established in the federal and state courts, trial and appellate.

■■ The power of an American court to disentitle a fugitive from access to its power and authority is an equitable one. *U.S. v. Sharpe,* 470 U.S. 675, 681 n. 2, 105 S.Ct. 1568, 1573 n. 2, 84 L.Ed.2d 605 (1985); *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1098 (1st Cir.1992); *U.S. v. Van Cauwenberghe,* 934 F.2d 1048, 1054–55 (9th Cir.1991); *U.S. v. Persico,* 853 F.2d 134, 136 (2d Cir.1988); *Brinlee v. U.S.,* 483 F.2d 925, 926 (8th Cir. 1973). *See also Conforte v. Commissioner,* 692 F.2d 587, 590 (9th Cir.1982), *stay denied,* 459 U.S. 1309, 103 S.Ct. 663, 74 L.Ed.2d 588 (1983).[6]

### B. Disentitlement of access to appellate courts.

The doctrine was first applied in the federal courts by the Supreme Court's denial of its processes for a fugitive's appeal to the Court from his conviction in Washington Territory. *Smith v. U.S.,* 94 U.S. 97, 24 L.Ed. 32 (1876). The Court drew upon earlier state cases. *Smith* was followed by *Bonahan v. Nebraska,* 125 U.S. 692, 8 S.Ct. 1390, 31 L.Ed. 854 (1887), a similar case. Soon after *Smith* and *Bonahan,* the Court considered the constitutionality of disentitlement when invoked by a state court. The Supreme Court of Georgia

had dismissed an appeal to it by a fugitive from a death penalty conviction. Over due process objections the Supreme Court affirmed. *Allen v. Georgia,* 166 U.S. 138, 17 S.Ct. 525, 41 L.Ed. 949 (1897). *Accord, Brinlee v. Crisp,* 608 F.2d 839, 857 (10th Cir.1979), *cert. denied,* 444 U.S. 1047, 100 S.Ct. 737, 62 L.Ed.2d 733 (1980).

In *Eisler v. U.S.,* 338 U.S. 189, 69 S.Ct. 1453, 93 L.Ed. 1897, *cert. dismissed,* 338 U.S. 883, 70 S.Ct. 181, 94 L.Ed. 542 (1949), the litigant appealed from a contempt of Congress conviction. After submission of his case to the Court on the merits he fled the country, and the Court, applying *Smith* and *Bonahan,* struck his case from the docket.

The most familiar federal case is *Molinaro v. New Jersey,* 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970), in which the Court, citing *Smith, Bonahan, Allen v. Georgia,* and *Eisler,* applied disentitlement to the appeal of a fugitive from a state court conviction.

> No persuasive reason exists why this Court should proceed to adjudicate the merits of a criminal case after the convicted defendant who has sought review escapes from the restraints placed upon him pursuant to the conviction. While such an escape does not strip the case of its character as an adjudicable case or controversy, we believe it disentitles the defendant to call upon the resources of the Court for determination of his claims. In the absence of specific provision to the contrary in the statute under which Molinaro appeals, 28 U.S.C. § 1257(2), we conclude, in light of the *Smith* and *Bonahan* decisions, that the Court has the authority to dismiss the appeal on this ground.

*Id.* at 366, 90 S.Ct. at 498–99. In 1975 the Court confirmed the history and vitality of the doctrine.

---

6. The doctrine is not jurisdictional in nature. *Molinaro v. New Jersey,* 396 U.S. 365, 366, 90 S.Ct. 498, 498, 24 L.Ed.2d 586 (1970) ("[S]uch [fugitive status] does not strip the case of its character as an adjudicable case or controversy...."); *United Elec., Radio & Mach. Workers, supra* ("Disentitlement is not a matter of jurisdictional dimension; rather, it is a concept premised on principles of equity."); *Van Cauwen-*

*berghe, supra; U.S. v. Freelove,* 816 F.2d 479, 480 (9th Cir.1987).

Nor does the doctrine implicate constitutional privileges; rather it rests upon the supervisory power of the federal court to administer the federal court system. *Goeke v. Branch,* — U.S. —, —, 115 S.Ct. 1275, 1277, 131 L.Ed.2d 152 (1995); *Ortega-Rodriguez,* 507 U.S. —, 113 S.Ct. 1199, 122 L.Ed.2d 581 (1993).

This Court itself has long followed the practice of declining to review the convictions of escaped criminal defendants ...[,] a long-standing and established principle of American law.

*Estelle v. Dorrough,* 420 U.S. 534, 537, 95 S.Ct. 1173, 1175, 43 L.Ed.2d 377 (1975).

Since *Molinaro* was handed down in 1970, in what we estimate to be more than 100 cases, all or substantially all federal circuit courts have invoked *Molinaro* and its predecessors and successors to disentitle appellants, criminal and civil, from the appellate processes of the court. In some cases the court has dismissed the appeal unconditionally, in others with conditions upon the fugitive's returning to custody within some fixed period. Other decisions have refused to reinstate appeals that have been summarily dismissed. Still other cases have been concerned with the effect of the fugitive's voluntary return to custody before fugitivity has been made an issue.[7]

■ Disentitlement of access to appellate court applies to appeals in civil cases as well as to criminal appeals: *Broadway v. City of Montgomery,* 530 F.2d 657 (5th Cir.1976) (dismissing the appeal in a § 1983 action of a fugitive from a state conviction); *Conforte v. Commissioner,* 692 F.2d 587, 589 (9th Cir. 1982) (dismissing the appeal of a civil tax assessment against appellant, a fugitive from a federal tax conviction, and stating, "[T]he rule [of disentitlement] should apply with greater force in civil cases where an individual's liberty is not at stake."), *stay denied,* 459 U.S. 1309, 103 S.Ct. 663, 74 L.Ed.2d 588 (1983); *Stern* v. *U.S.,* 249 F.2d 720 (2d Cir. 1957) (dismissing the appeal by fugitives from fines and costs for contempt in failing to obey a grand jury subpoena), *cert. denied,* 357 U.S. 919, 78 S.Ct. 1360, 2 L.Ed.2d 1364 (1958).

Numerous cases have denied appellate access to appellants seeking review of denials of habeas corpus relief. *Johnson v. Laird,* 432 F.2d 77 (9th Cir.1970) (district court dismissed petition for habeas corpus, litigant went AWOL pending his appeal, appeal dismissed); *Arana v. U.S. Immigration & Nat. Serv.,* 673 F.2d 75 (3d Cir.1982) (dismissing the appeal of the denial of a habeas corpus petition of litigant who had been declared deportable and had hidden his whereabouts from authorities); *Gonzales v. Stover,* 575 F.2d 827 (10th Cir.1978) (habeas petition by fugitive dismissed, certificate of probable cause denied by circuit court); *U.S. v. Glomb,* 877 F.2d 1 (5th Cir.1989) (affirming the dismissal of a habeas corpus petition on the ground that fugitivity was a voluntary by-pass where, after pleading guilty with the right to appeal a constitutional issue, defendant escaped and his direct appeal was dismissed); *Lopez v. Malley,* 552 F.2d 682 (10th Cir.1977) (petition for habeas denied, petitioner fled pending appeal, appeal dismissed).

In *Van Blaricom v. Forscht,* 490 F.2d 461 (5th Cir.1974) (en banc), *cert. denied,* 423 U.S. 915, 96 S.Ct. 222, 46 L.Ed.2d 144 (1975), disentitlement was retroactively applied in a civil case by an en banc decision of the Court of Appeals, which vacated the decision of a panel that had not known appellant was a fugitive. In a civil case the Third Circuit applied disentitlement prospectively in *Ali v. Sims,* 788 F.2d 954 (3d Cir.1986), to deny a fugitive future access to the district court for a new trial. Damages were awarded to plaintiff. Plaintiff and defendants appealed, and plaintiff fled, hijacking a plane and endangering passengers. The court reversed the judgment for plaintiff but, applying Fed. R.Civ.P. 37 and 41 and *Molinaro,* held plaintiff was not entitled to a new trial.

> [T]he principles of *Molinaro* intersect with the principles underlying Fed.R.Civ.P. 37 & 41, which render a party's misconduct a basis for the dismissal of his case. *See supra* pp. 957–958. Indeed, the cases involving dismissals under the Federal Rules generally entail conduct far less egregious than a flight from justice. Thus, the jurisprudence upholding such sanctions as necessary and proper in an era of court backlogs dovetails with the *Molinaro* doctrine. *Cf. Eash v. Riggins Trucking, Inc.,* 757 F.2d 557 (3d Cir.1985) (*in banc*) (it is

---

7. State appellate cases invoking disentitlement are legion since long before, and after, *Molinaro.* Indeed, *Smith v. U.S.,* the first Supreme Court case, and *Allen v. Georgia,* drew on state authorities.

within the "inherent powers" of the court to take such actions as are necessary for the effective administration of the judicial system).

In sum, the concerns that animate *Molinaro* as well as the principles that undergird Rule 37 and Rule 41 sanctions, dictate that Ali, whose contempt for justice was manifest in the egregious act of skyjacking a plane and endangering innocent lives in a flight from justice, not be awarded a new trial.

*Id.* at 959.

## C. Disentitlement of access to federal trial courts.

■ Disentitlement applies to federal trial courts in civil cases as well as to appellate courts.[8]

Civil litigation, in general: *Schuster v. U.S.*, 765 F.2d 1047 (11th Cir.1985) (affirming the dismissal of a petition by a fugitive for review of a tax assessment); *Doyle v. U.S. Dep't of Justice*, 668 F.2d 1365 (D.C.Cir.1981) (affirming the dismissal of an FOIA suit by a fugitive seeking records), *cert. denied*, 455 U.S. 1002, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982); *Dawkins v. Mitchell*, 437 F.2d 646 (D.C.Cir.1970) (affirming the dismissal of a civil suit by a fugitive to enjoin enforcement of a warrant).

Section 1983 cases: *Seibert v. Johnston*, 381 F.Supp. 277 (E.D.Okla.1974) (dismissed for fugitivity); *Beckett v. Cuyler*, 523 F.Supp. 104 (E.D.Pa.1981) (§ 1983 case alleging unconstitutional conditions of confinement, case closed when petitioner escaped; Rule 60(b) motion to reopen denied based on *Molinaro* ).[9]

Habeas corpus cases: *Bailey v. U.S. Commanding Officer*, 496 F.2d 324 (1st Cir.1974) (affirming the dismissal of a petition for habeas corpus by person AWOL from the Army); *Clark v. Dalsheim*, 663 F.Supp. 1095

(S.D.N.Y.1987) (fugitive from state conviction and from arrest warrants on other charges; petition for habeas dismissed); *U.S. v. Collins*, 651 F.Supp. 1177 (S.D.Fla.1987) (28 U.S.C. § 2255 petition granted by court without knowledge that petitioner had just escaped; court *sua sponte* reinstated conviction and sentence and vacated relief granted); *Potter v. Davis*, 519 F.Supp. 621 (E.D.Tenn. 1981) (state criminal appeal dismissed for fugitivity; federal habeas denied because decision proper under state law and federal law), *aff'd*, 701 F.2d 180 (6th Cir.1982) (table); *Lewis v. Delaware State Hosp.*, 490 F.Supp. 177 (D.Del.1980) (petitioner fugitive from confinement in state mental hospital pursuant to finding of not guilty by reason of insanity).

Civil forfeiture cases: *U.S. v. Timbers Preserve*, 999 F.2d 452 (10th Cir.1993) (affirming the forfeiture of real estate in a default judgment against claimant for fugitivity); *U.S. v. Eng*, 951 F.2d 461 (2d Cir.1991) (affirming the default judgment against a fugitive in a forfeiture case); *U.S. v. One Parcel of Real Estate*, 868 F.2d 1214 (11th Cir.1989) (affirming the denial to a fugitive of access to trial of an in rem forfeiture action); *U.S. v. $129,374 in U.S. Currency*, 769 F.2d 583 (9th Cir.1985) (affirming the denial of a petition by a conservator of a fugitive's estate to intervene in a civil forfeiture case), *cert. denied*, 474 U.S. 1086, 106 S.Ct. 863, 88 L.Ed.2d 901 (1986); *U.S. v. $45,940 in U.S. Currency*, 739 F.2d 792 (2d Cir.1984) (affirming judgment on the pleadings for the government against a fugitive seeking remission of forfeited funds); *U.S. v. Real Property Located at Incline Village*, 47 F.3d 1511 (9th Cir.1995) (affirming order striking opposition to forfeiture of drug-related realty, filed by defendant who had fled to Switzerland from indictment on drug charges); *U.S. v. One Parcel of Real Property*, 776 F.Supp. 482

---

**8.** Disentitlement has little play for the criminal accused at his merits trial, since fugitivity before or during trial invokes other doctrines. But see *U.S. v. Sacco*, 571 F.2d 791 (4th Cir.), *cert. denied*, 435 U.S. 999, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978), in which a question arose during trial of whether the government had relied upon allegedly improper wiretap evidence. The court reserved ruling on the taint issue until after trial.

After a verdict of guilty the court began a taint hearing. Before it was completed the defendant fled. The court dismissed the taint proceeding. The court of appeals affirmed on *Molinaro*.

**9.** We have above noted *Broadway*, which denied appellate court access for a § 1983 appeal brought by a state fugitive.

(W.D.Mo.1991) (opposition to forfeiture barred when filed by petitioner avoiding service of an outstanding warrant), *aff'd*, 982 F.2d 526 (8th Cir.1992) (table); *U.S. v. $182,-980 in U.S. Currency*, 727 F.Supp. 1387 (D.Colo.1990) (default judgment against claimant for fugitivity).[10]

Two forfeiture cases have emphasized the unwillingness of a fugitive to return to the United States to process a claim that he is himself asserting. In *U.S. v. Eng*, 951 F.2d 461 (2d Cir.1991), the litigant had fled to Hong Kong from a U.S. indictment charging RICO and narcotics violations. The district court denied his claim to property which was the subject of a civil forfeiture proceeding. In affirming, the Court of Appeals noted that he—like Mr. Prevot—was unwilling to return voluntarily to the United States to face criminal charges and would not agree to return to contest the forfeiture. *Id.* at 464–65. The Ninth Circuit, in *Real Property Located at Incline Village*, commented upon the petitioner's status as fugitive from an indictment:

> At [the time of the district court's order] he was apparently free to return to the United States to contest the forfeiture action, but chose not to do so, presumably to avoid arrest on the criminal charges. Under these circumstances, Brian was a fugitive. *See $129,374*, 769 F.2d at 587–88 ("It is important to recognize that Lewis has complete control over the protection of his property interests in this forfeiture proceeding; if he finds his interests are sufficiently worth defending, he can terminate his fugitive status and present his own defense.") . . . .

*Id.* at 1516.

### D. The power of the district court.

▆▆▆▆▆▆ Disentitlement is consistent with the inherent power of a court to manage its own affairs. *See Ali*, 788 F.2d at 959; *Doyle v. U.S. Dep't of Justice*, 494 F.Supp. 842, 845

(D.D.C.1980), *aff'd*, 668 F.2d 1365 (D.C.Cir. 1981), *cert. denied*, 455 U.S. 1002, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982). Inherent powers do not derive from statute but are "powers vested in the courts upon their creation." *Eash v. Riggins*, 757 F.2d 557, 561 (3d Cir. 1985) (en banc). *See also U.S. v. Hudson*, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812) ("Certain implied powers must necessarily result to our courts of justice from the nature of their institution."). The inherent powers of the federal court have been described as:

> "rooted in the notion that a federal court, sitting in equity, possesses all of the common law equity tools of a Chancery Court (subject, of course, to congressional limitation) to process litigation to a just and equitable conclusion." *ITT Community Development Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir.1978); *cf. Hall v. Cole*, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973) (courts possess "inherent equitable power"); *Johnston v. Marsh*, 227 F.2d 528, 531 (3d Cir.1955) ("Our Federal judiciary has consistently recognized that at common law this inherent power existed.").

*Eash*, 757 F.2d at 563.

> [A]t least in the absence of contrary legislation, courts under their inherent powers have developed a wide range of tools to promote efficiency in their courtrooms and to achieve justice in their results.

*Id.* at 564. Inherent powers include contempt power, sentences for abuse of the judicial process, *id.* at 561, dismissal for failure to prosecute, and disciplinary power over attorneys. The power to dismiss exists in many situations. The district court has the inherent power to dismiss *sua sponte* for want of jurisdiction. The power to dismiss under Fed.R.Civ.P. 41(b) recognizes a power of ancient origin in law and equity. *Link v. Wabash R.R. Co.*, 370 U.S. 626, 82 S.Ct. 1386,

---

**10.** The Seventh Circuit reversed a district court's application of disentitlement to a litigant who contested forfeiture of his funds, on the ground that it was inappropriate where the government had initiated the action and fugitivity had not been proved. *U.S. v. $40,877.59 in U.S. Currency*, 32 F.3d 1151 (7th Cir.1994). The Sixth Circuit allowed a fugitive to appeal the district court's forfeiture order because it was an in rem proceeding and other creditors might have rights. *U.S. v. $83,320 in U.S. Currency*, 682 F.2d 573 (6th Cir.1982). The Second, Ninth and Eleventh Circuits have declined to follow the in rem rationale: *$45,940, supra; $129,374, supra, One Parcel, supra*. In any event the issues of governmental initiation of a forfeiture action and the effect of its being an in rem proceeding are not present in the case before us.

8 L.Ed.2d 734 (1962). Under some circumstances a court may dismiss under the ancient doctrine of forum non conveniens. 15 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3828 (2d ed. 1986). A court has the inherent power to manage its docket, subject of course to statutes requiring special treatment for specified types of cases.

■ The district court limited its consideration of equity powers to "unclean hands," and rejected that rubric as a "traditional equity defense" to which the Act was not subject. 855 F.Supp. at 922. This case does not involve balancing individual equities between the parties. Pretermitting whether "unclean hands" can ever be asserted as a "defense" or exception in an ICARA case by the party opposing the claim for return, disentitlement is an issue between the claimant and the court, arising from conduct by the claimant that triggers the institutional, and inherent, equitable power of the court itself to respond to that conduct. We find nothing in the Convention or the Act that purports to strip an American court of the powers inherent to it as a court. Because of the unique facts, the core of this case is not custody, or competing interests of parents, but fundamental concerns of how the United States operates its courts and how those courts may react to abuses of American criminal process, to defiance of judicially-imposed obligations owed to victims of crime, and to flights from financial responsibilities to our government.

■ For the same reasons it is not relevant to the disentitlement issue that Ms. Prevot accompanied her husband to France. Mr. Prevot went to France with his wife and children in tow, but he is no less a fugitive, no less disdainful of his responsibilities to United States courts and obligations.

## IV. Nexus or Connection

■ We turn to the relationship between the conviction from which the litigant has fled and the claim with respect to which disentitlement is considered. It does not matter that the court of conviction and the court from whose processes the fugitive is excluded are from different sovereigns. In many of the cases, including seminal Supreme Court cases that we have discussed, the litigant was a fugitive from a state conviction and his federal appeal was dismissed. *Broadway* specifically held that it was immaterial that the litigant had fled from the custody of another sovereign. 530 F.2d at 659. Moreover, it is inherent that the interests of two sovereigns are implicated in each of the many cases of disentitlement to access to federal courts for habeas review of state convictions.[11]

■ The Supreme Court has expressed doubt about a rule that would require automatic dismissal of an appeal for conduct by a defendant having no connection with the appellate proceedings. *Ortega–Rodriguez v. U.S.*, 507 U.S. ——, ——, 113 S.Ct. 1199, 1207, 122 L.Ed.2d 581 (1993). Other cases have commented on the existence of a nexus. *Conforte*, while pretermitting whether a nexus was mandated, found a nexus was present: i.e., the litigant's conviction for evasion of employment taxes and his tax court appeal "are each related components of a general tax evasion scheme." 692 F.2d at 592. In this case our concern is not with a connection between this appellate court and the courts of Texas but with the connection between the Texas conviction and the claim before the district court, for we are reviewing the district court's denial of disentitlement. Assuming a nexus was required between the district court proceeding and the Texas conviction, it

11. While not a prerequisite to our decision, we note that in this case both sovereigns have well-established policies of disentitlement. Texas incorporated disentitlement into its statutory law, Tex.Code Crim.Proc.Ann. art. 44.09, which provided that if a defendant convicted of a felony flees pending his appeal the jurisdiction of the appellate court shall no longer attach. The statute was held constitutional, even as applied to a fugitive whose appeal was dismissed after his recapture. *Estelle v. Dorrough*, 420 U.S. 534, 95 S.Ct. 1173, 43 L.Ed.2d 377 (1975). The Texas statute replaced a somewhat similar common law rule. *Id.* at 535 n. 1, 95 S.Ct. at 1174 n. 1. The statute was applied in *Thompson v. State*, 641 S.W.2d 920 (Tex.Crim.App.1982). It was repealed and replaced in 1986 by Rule 60, Tex. Rules App.Proc., which provides for dismissal of a criminal appeal on motion of the state if the appellant has escaped pending appeal and has not voluntarily returned within 10 days after escaping.

was present. Mr. Prevot's flight and his subsequent invocation of ICARA were, paraphrasing *Conforte,* "related components of a general scheme." He fled to escape his criminal conviction and other responsibilities to court, probation officers, victim and government, and to assemble and hold his family in a refuge beyond the reach of American courts and American responsibilities. In Mr. Prevot's hands ICARA is a tool used to permit him to escape American justice and responsibilities while holding his children with him. Flight was but one step, and an ICARA claim the latest link, in a chain of proximately related events that began with the Texas conviction and ended in the district court proceedings in this case. It is obvious that if Mr. Prevot returned to the United States and was imprisoned he could not successfully maintain an ICARA claim. Either the habitual residence of the children would have changed, or they would no longer be in his custody, or the exceptions relating to risk of harm to the children would apply.

Our decision is consistent with concerns addressed by the Supreme Court in *Ortega–Rodriguez.* The Court recognized that "our cases consistently and unequivocally approve dismissal [by an appellate court] as an appropriate sanction when a prisoner is a fugitive during 'the ongoing appellate process.'" 507 U.S. at ——, 113 S.Ct. at 1204. Its central concern was whether the same rationale mandated dismissal of the appeal of a defendant who fled the jurisdiction of a district court but was recaptured before he appealed. Mr. Prevot is within the pattern of cases "consistently and unequivocally approv[ing] dismissal as an appropriate sanction." He was a fugitive during the ongoing process; the only difference is that the relevant process is that of the trial [federal district] court rather than the appellate court. He triggered the relevant process by filing this case while he was an unrecaptured fugitive, he remains in that status, and there is no indication that it will ever change. The Court in *Ortega–Rodriguez* noted that the defendant had been recaptured and was within the power of the district court, which was capable of defending its own jurisdiction by imposing appropriate punishment. *Id.* at ——, 113 S.Ct. at 1207. In the present case Mr. Prevot is at large and the Texas court has no way (short of the dubious, expensive, and tortious possibilities of extradition) to protect its interest, nor does the unreimbursed victim of Mr. Prevot's theft, or the IRS, or the Tennessee probation system have means to safeguard its respective interests. In a practical sense, the only agency with power to sanction Mr. Prevot is the district court whose power and authority he himself invoked.

Mr. Prevot has flouted the interests of the criminal courts in enforcing his criminal conviction. He has walked away from his agreement—made to the court to obtain probation—to make restitution to his victim. He has spurned his obligation to the United States government for taxes. He has misused the Tennessee probation processes. He has inhibited the processes of the United States District Court in this case by making unavailable to it the depth of expert testimony that the court indicated that it needed. He has abused the laudable purposes of ICARA by employing it to further his scheme. His fugitivity, and his actions, constitute abuses to which a court should not accede.

The decision of the district court in No. 94–5854 is REVERSED and the case is REMANDED with instructions to dismiss the case.

In case No. 94–6440, pursuant to 42 U.S.C. § 11,607(b), the district court assessed against Ms. Prevot attorney's fees and the expenses of transporting the children to France. The final order in that case is REVERSED.