**Amalin HAZBUN ESCAF, Petitioner,**

v.

**Isidoro RODRIQUEZ,[1] Respondent.**

**No. CIV.A. 01–1926–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

May 6, 2002.

---

1. The caption of the complaint lists respondent's name as "Rodriquez" with a "q" but all other pleadings spell the name "Rodriguez" with a "g". The more common "Rodriguez" spelling will be used here in all instances except in the caption.

Stephen J. Cullen, Miles & Stockbridge P.C., Towson, MD, Patrick Hanley Stiehm, Stiehm Law Office, Alexandria, VA, for Plaintiffs or Petitioners.

Isidoro Rodriguez, Law Offices of Isidoro Rodriguez, Alexandria, VA, for Defendants or Respondents.

## *MEMORANDUM OPINION*

ELLIS, District Judge.

Petitioner brought this action under the Hague Convention on the Civil Aspects of International Child Abduction[2] (Hague Convention) and the International Child Abduction Remedies Act[3] (ICARA) to secure the return of her son to Colombia from the keep of respondent, the child's father. Respondent moved to dismiss the petition (i) for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), Fed. R.Civ.P., (ii) for failure to join the child as an indispensable party, pursuant to Rules 12(b)(7) and 19, Fed.R.Civ.P., and (iii) for abstention pursuant to *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The motion to dismiss was denied[4] and the matter set for a prompt trial.[5]

A bench trial was held on April 25 and May 1, 2002. Petitioner presented the testimony of one witness: Amalin Hazbun Escaf. Respondent presented the testimony of five witnesses: (1) Timothy Moore, chief executive officer of SOCOCO Construction who has lived in Colombia for approximately thirty-five years; (2) Derek Steele, teacher and counselor at Mark Twain Middle School; (3) Montgomery Blair Sibley, general manager of Alodus Corporation; (4) Irene Rodriguez, respondent's wife, who is a licensed Colombian attorney and who is employed as respondent's legal assistant; and (5) Isidoro Rodriguez Hazbun, the child whose return is being sought under the Convention.[6] Also admitted into evidence were approximately

**2.** Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, 1988 WL 411501 (entered into force Dec. 1, 1983; for the United States July 1, 1988; for Colombia March 1, 1996; between Colombia and the United States June 1, 1996).

**3.** 42 U.S.C. § 11601 *et seq.* The statute implements the Hague Convention in the United States and specifically states that its provisions "are in addition to and not in lieu of the provisions of the Convention." 42 U.S.C. § 11601(b)(2).

**4.** *See Hazbun Escaf v. Rodriquez,* 191 F.Supp.2d 685 (E.D.Va. 2002) (order); *Haz-*

*bun Escaf v. Rodriquez,* 191 F.Supp.2d 685 (E.D.Va.2002) (memorandum opinion).

**5.** The Convention requires that judicial authorities "act expeditiously in proceedings for the return of children." Hague Convention art. 11.

**6.** Isidoro, who celebrated his thirteenth birthday on March 10, 2002, was called to testify in this matter by his father, the respondent. To minimize any intimidation Isidoro might feel as a result of testifying in open court and to facilitate the Court's assessment of his maturity level, Isidoro's testimony was taken in chambers, on the record, with the parties and counsel present. In this environment, the

thirty exhibits. The following findings of fact and conclusions of law are issued pursuant to Rule 52, Fed.R.Civ.P.

## FINDINGS OF FACT

1. Petitioner Amalin Hazbun Escaf (Hazbun) is a citizen of Colombia currently residing in Barranquilla, Colombia and employed as an optometrist.

2. Respondent Isidoro Rodriguez (Rodriguez) is a U.S. citizen currently residing in Fairfax County, Virginia. He is a member of the Virginia Bar and appears *pro se* in this matter.

3. Hazbun and Rodriguez were married in Colombia on August 6, 1988. They had a child, Isidoro Rodriguez Hazbun (Isidoro), on March 10, 1989. Isidoro was born in Barranquilla, Colombia, but is also a United States citizen by virtue of his father's citizenship. The family, including two of Hazbun's children from a previous marriage, lived together in Barranquilla for approximately seven years until 1996.

4. In the fall of 1996 Hazbun and Rodriguez separated, and in the spring of 1997 they divorced. Rodriguez continued to reside in Barranquilla until January 2000, when he came to reside full-time in Virginia. During the period of the separation and continuing through the time of the divorce, Isidoro resided with Hazbun in Barranquilla.

5. Rodriguez alleges that, coinciding with the separation, he and Hazbun arrived at a verbal agreement that they would share custody of their son such that Isidoro would divide his time equally between his parents. Hazbun testified, however, that there was no such agreement. There is no record evidence of the alleged agreement, and no court ever recognized this alleged agreement.

6. Then, in August 1997, the First Family Court of Barranquilla, Colombia approved a different custody agreement entered into by Hazbun and Rodriguez providing that Isidoro would reside with, and be primarily in the care of Hazbun, but would spend every other weekend with Rodriguez.[7] Pursuant to this court-approved custody agreement, the summer holidays were to be divided evenly with Isidoro spending equal time with each parent. The agreement also provided that both parents were to share the right and the responsibility for the education and the moral and intellectual upbringing of their child. In this regard, Rodriguez was to retain certain responsibilities for taking Isidoro to evening sports practices and academic lessons. In a second judicial order, the Barranquilla Family Court clarified that Hazbun retained formal custody of Isidoro.[8] The record reflects that both Hazbun and Rodriguez exercised their respective rights under the court-approved custody agreement.

7. Following the divorce, Isidoro continued to live with his mother in Barranquilla, where he continued as a student in good standing at Marymount School, a private, bilingual, Catholic school.[9] It is undisputed, and the record convincingly reflects that from birth to age twelve, Isidoro lived a full life as a young child growing up in

---

Court interviewed Isidoro, asking him a number of questions about his life in Colombia and Virginia, as well as his concerns and preferences. Following this, the parties were given an opportunity to ask Isidoro questions.

7. *See Amalin Hazbun Escaf v. Isidoro Rodriguez Cruz* (First Family Court, Barranquilla, Colombia Aug. 1, 1997).

8. *See Amalin Hazbun Escaf v. Isidoro Rodriguez Cruz,* Ref. No. 23.833 (First Family Court, Barranquilla, Colombia Aug. 26, 1997).

9. The record reflects that Isidoro's place at Marymount School has been reserved in his absence.

Barranquilla; he participated in sports, had many friends, and maintained an active family and social life.

8. After Rodriguez moved to Virginia, Hazbun and Rodriguez agreed to have Isidoro travel to the United States to visit his father on three separate occasions. For Isidoro to travel outside Colombia, his parents had to provide Colombian authorities with notarized exit authority specifying Isidoro's departure and return dates. The first two visits were without incident: Isidoro visited his father in the United States during the summer of 2000 for one month and then again during Christmas vacation in 2000 for approximately two weeks. Isidoro's third trip to the United States was scheduled to commence on June 7, 2001 and conclude on July 14, 2001. Pursuant to the requisite notarized exit authority provided by Hazbun and Rodriguez, Isidoro traveled to the United States on June 7, 2001, using a ticket paid for by his father.

9. On July 13, 2001, one day before Isidoro's scheduled return to Colombia, Rodriguez sent a facsimile transmission to Hazbun in Colombia informing her that Isidoro would be remaining in the United States and would not be returning to Colombia as planned. Also included in the transmission were (i) a letter from Isidoro to his mother informing her that he wanted to stay with his father,[10] and (ii) a copy of a petition for change of custody filed by Rodriguez in Isidoro's name in Fairfax County Juvenile and Domestic Relations Court.[11]

10. Consistent with the facsimile notice received by Hazbun, Isidoro did not return to Colombia. Instead, Isidoro has remained continuously in Virginia with his father since June 7, 2001. During this period, Isidoro, a seventh grader, has attended the Mark Twain Middle School in Fairfax County, Virginia, where he participates in sports, has made new friends, and maintains an active social life. He has also maintained telephone contact with his mother and family in Barranquilla.

11. In sum, the record reflects that until his failure to return to Colombia on July 14, 2001, Isidoro had lived his entire life in Barranquilla, Colombia, making only occasional trips abroad.

12. On August 15, 2001, Hazbun filed a Hague Convention Return Application with the Colombian Central Authority,[12] seeking the return of Isidoro to Colombia.

---

**10.** The Spanish original and an English translation of the July 13, 2001 letter were admitted into evidence. The translation of the letter admitted into evidence reads as follows:

Hello mommy how are you? I hope OK. I write you to tell you that I want to stay here. I tell you this now from here, because you know that if I [told] you there you would not let me come.

Mommy, I love you much and you know that I am always going to love you and to be your son, but now I want to spend time with my dad. Here everything is organized and I like the school its name is "Mark Twain Middle School". Besides I will improve my English and things are not so unsafe as in Colombia, neither there is guerrilla. Besides I am growing into a man and let's accept you are not [a] man. There are things I need to learn from him. I do not want this to turn into a fight you know

that I hate when you fight. I am happy here, as I was when with you, but it is that here there are more opportunities in the study; besides I am getting [ready] for college. I know you love me and want the best for me and that I be happy, well this makes me happy. I love you much and I will miss you but so I miss my dad. I love you much and Chachi and Mayri and I am going to miss you. Please let's talk every day.

Thanks a very big kiss

Isi

(errors in original).

**11.** *Isidoro Rodriguez–Hazbun v. Amalin Hazbun Escaf,* Case No. JJ–347–050–01–01 (Juv. & Dom. Rel. Ct. of Fairfax Cty., filed July 13, 2001).

**12.** Each nation that is a party to the Convention is required to designate a Central Author-

13. On December 20, 2001, Hazbun filed this suit against Rodriguez seeking the return of Isidoro to Colombia under ICARA and the Hague Convention.

14. At trial, Hazbun offered her own testimony, which credibly and convincingly established those matters set forth in paragraphs 1 through 13 above.

15. At trial, Rodriguez offered various exhibits and the testimony of witnesses in an attempt to show (i) that Isidoro would be in danger in Colombia, (ii) that Colombia's courts are corrupt and failed to provide due process, and (iii) that Isidoro is mature and wishes to remain in the United States.

16. With respect to conditions in Colombia, there is no persuasive evidence of a serious risk of physical or psychological harm to Isidoro if he is returned to Colombia. At best, the record reflects a general current risk of harm to U.S. citizens in Colombia, but no specific risk of harm either to Isidoro or, more generally, to children in Barranquilla, Colombia who are Colombian as well as American citizens. Thus, the record contains a travel warning issued by the U.S. Department of State on April 17, 2001 advising U.S. citizens against travel to Colombia. The travel warning advised that U.S. citizens in Colombia are the victims of threats, kidnappings, domestic airline hijackings, and murders and that threats targeting U.S. citizens are expected to continue and possibly increase in response to U.S. support for Colombian drug eradication programs. The State Department further warned that nearly 120 U.S. citizens have been kidnapped in Colombia over the past 20 years. No information is provided concerning the age of the kidnapping victims.

17. Timothy Moore, a U.S. citizen who has lived in Colombia for approximately thirty-five years also offered testimony concerning conditions in Colombia. Moore is the chief executive officer of a heavy construction and mining company that has operated in Colombia since 1948 and uses Barranquilla as its principal base for Colombian maintenance facilities. Moore testified that he recently moved from Colombia to Miami for security reasons and, although his company formerly maintained a guest facility in Barranquilla for its visiting executives, these executives now, and for the past twelve months, have stayed instead in Barranquilla's principal hotel for reasons of security. Moore stated he has received kidnapping threats against himself and other employees, and that American employees of his company have been kidnapped when working on a railroad construction project in northeastern Colombia near the Venezuelan border, a distance of more than 200 kilometers from Barranquilla. Moore now visits Colombia only for business and is accompanied by four bodyguards if he leaves the immediate area of Barranquilla.

18. Montgomery Blair Sibley, an American lawyer admitted to practice in several jurisdictions, testified that he has traveled to Barranquilla about six times since 1990. Sibley was last in Colombia four years ago, but is now reluctant to return for reasons of personal safety. Sibley has seen Isidoro approximately once a month since Isidoro has been in the United States.[13]

19. Irene Rodriguez, respondent's legal assistant and a licensed Colombian attorney, worked for twelve years in respondent's law office. She was married to

---

ity to discharge the duties created by the Convention. *See* Hague Convention art. 6.

**13.** During these visits, Blair, it appears, had several conversations with Isidoro concerning Isidoro's wishes regarding returning to Colombia. Rodriguez was not permitted to elicit Blair's hearsay testimony concerning Isidoro's statements to him. *See* Rule 803, Fed. R.Evid.

respondent in November 2000 and now resides with him in Virginia. Although a Colombian citizen, she is afraid to return to Colombia because of the situation there. She testified that, in 1997, Rodriguez was harassed by Colombian security officials and his office in Barranquilla was robbed. She further testified that, in February 2000, Rodriguez was threatened with kidnapping. Specifically, Irene Rodriguez testified that a notice posted on the outside door of Rodriguez's home in the Santa Veronica neighborhood of Barranquilla included a "kidnapping list" that named several persons. Rodriguez was not mentioned by name, but "the gringo" was mentioned on the list, which Irene Rodriguez and Rodriguez took to be a reference to Rodriguez.

20. Rodriguez genuinely fears for Isidoro's safety if Isidoro is returned to Colombia, partly because Rodriguez fears that his enemies might attempt to get to him through his son. Yet this fear has no persuasive record support. No threat has ever been directed to Isidoro and indeed, he lived in Barranquilla without incident for one and a half years after the threat Rodriguez believed was directed to him.[14] Moreover, Hazbun testified credibly that she is confident of her son's safety in Barranquilla. In this respect, she points out that Isidoro has many cousins and

friends his age in Barranquilla, and there is no evidence that any of them have been threatened or harmed because of the political situation in Colombia.

21. At most, then, the evidence establishes (i) that Colombia may be a dangerous place for some American businessmen and (ii) that there has been a threat to Rodriguez in Barranquilla. There is no persuasive evidence specifically establishing a risk to Isidoro of kidnapping or violence in Barranquilla.[15]

22. With respect to alleged corruption and lack of due process in the Barranquilla Family Court, the record contains documentary evidence of two petitions filed by Hazbun in Colombian Family Court for (i) an order increasing the monthly food allowance paid by Rodriguez to Hazbun for the maintenance of Isidoro, and (ii) an order requiring Rodriguez to pay past-due installments. These petitions were apparently filed and ruled upon without providing Rodriguez with notice or opportunity for a hearing.[16]

23. With respect to Isidoro's maturity and adjustment to life in the United States, Rodriguez presented the testimony of Derek Steele, who is Isidoro's math teacher at Mark Twain Middle School. Steele testified that Isidoro is a bright young man who is different from the other

14. Furthermore, Isidoro did not live at the residence in Barranquilla where the kidnapping threat was posted, as he had resided with his mother since the 1996 separation.

15. An excluded exhibit (hearsay) indicates that in January 2002 there were 27 kidnappings of minors in Colombia as a whole, but this data was not broken down by geographic area, nor were the victims' nationalities specified. This exhibit separately reported that in January 2002 there was one kidnapping in the Colombian Province that includes the city of Barranquilla, but the victim's age and nationality were not specified. To put these figures in the proper perspective it is useful to note that Barranquilla is the fourth largest city in Colombia with a population of 1.3 million persons and that Colombia's total population is 43 million. Given this and given the lack of specificity, this exhibit, even assuming its admissibility, does not persuasively establish a serious risk of harm to Isidoro in Barranquilla.

16. The petitions were dated July 2000 and April 2001, and the Family Court's order was issued April 25, 2001. All of this occurred after the August 1997 entry of the Barranquilla Family Court order approving the parties' custody agreement, as to which there is no allegation of lack of notice or opportunity to be heard.

boys his age in that he does not misbehave when the teacher leaves the classroom.

24. Finally, Rodriguez presented the testimony of Isidoro to establish the child's maturity and his desire to remain in the United States. In this regard, (i) Isidoro stated that he enjoyed his life in Barranquilla, but says he now prefers to stay in the United States so that he can live with his father for the time being. He indicated that he would prefer to spend alternate years with each of his parents. (ii) He also mentioned better job and educational opportunities as other reasons for staying in the United States. (iii) Finally, Isidoro indicated that he is concerned about violence in Colombia, although he has not received any personal threats and does not seem to fear for his own safety in Colombia. Isidoro testified that he has maintained regular contact with his mother and other friends and family in Colombia during his ten months in the United States.

25. It is apparent from his demeanor, his manner, and the nature of his testimony that Isidoro is a normal thirteen-year-old boy whose English is quite good, although not as good as his Spanish, which, for the first twelve years of his life, was his principal language. Isidoro exhibits a level of maturity commensurate with, but no greater than, the level of maturity reasonably expected of a typical boy his age. Thus, although his stated wish to remain with his father in the United States for the time being appears genuine,[17] his observations concerning jobs and opportunities in this country and the dangers in Colombia appear clearly to be the product of suggestion by others.

17. *See supra* ¶ 24.

18. T.I.A.S. No. 11670.

19. 42 U.S.C. § 11601 *et seq.*

20. Although some of the defenses to the return of a child under the Convention raise issues that may mirror those in a custody

## CONCLUSIONS OF LAW

1. Hazbun filed this action pursuant to the Hague Convention,[18] as implemented in the United States by ICARA.[19] The Hague Convention establishes legal rights and procedures for the prompt return of children who have been "wrongfully removed to or retained in" a nation that is a party to the Convention. Hague Convention, art.1; 42 U.S.C. § 11601(a). Through the adoption of the Convention, the signatory nations, including Colombia and the United States, sought "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, preamble. Thus, the primary purpose of the Convention is "to preserve the status quo" with respect to child custody and to deter feuding parents from "crossing international boundaries in search of a more sympathetic [custody] court." *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001).

2. The scope of a court's inquiry under the Convention is limited to the merits of the claim for wrongful removal or retention. *See* 42 U.S.C. § 11601(b)(4); Hague Convention, art. 16. Accordingly, the merits of any underlying custody case are not at issue. *See Miller*, 240 F.3d at 398; Hague Convention, art. 19.[20] Put differently, the focus of a court's inquiry in a Hague Convention case is not "the best interests of the child," as it typically is in a state custody case; rather it is the specific

dispute, *see, e.g.,* Hague Convention, art. 13(b) (a court is not bound to order return if it would expose the child to grave risk of physical or psychological harm), the purpose of the Hague Convention proceeding is not to determine the best interests of the child, as is true in a custody dispute.

claims and defenses under the Convention, namely whether a child has been wrongfully removed to, or retained in, a country different from the child's habitual residence and, if so, whether any of the Convention's defenses apply to bar the child's return to his habitual residence.

■ 3. ICARA, enacted in 1988, established procedures for the implementation of the Hague Convention in the United States. In this regard, it defined and allocated the burdens of proof for various claims and defenses under the Convention. *See* 42 U.S.C. § 11601 *et seq.*[21] Specifically, ICARA requires that a petitioner under the Hague Convention establish, by a preponderance of the evidence, that the child whose return is sought has been "wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A). And, in this respect, the Convention reflects "a strong presumption favoring return of a wrongfully removed child." *Danaipour v. McLarey,* 286 F.3d 1, 13 (1st Cir.2002). If a petitioner establishes by a preponderance of the evidence that a respondent's retention of a child was wrongful within the meaning of the Convention, the child's return is required unless the respondent can establish one of the Convention's five available defenses.[22] And significantly, these defenses to a child's return are to be construed narrowly.[23] Indeed, a court retains discretion to order a child's return even if one of the defenses is proven. *Miller,* 240 F.3d at 402 (citing Pub. Notice 957, 51 Fed.Reg. 10,494, 10,509 (1986)).[24]

■ 4. Thus, to establish in this matter that Isidoro was wrongfully retained in the United States, Hazbun must prove by a preponderance of the evidence (i) that Isidoro was habitually resident in Colombia at the time Rodriguez retained Isidoro in the United States; (ii) that the retention was in breach of Hazbun's custody rights under Colombian law; and (iii) that she had been exercising those custody rights at the time of retention, or would have been exercising them but for the retention. *See Miller,* 240 F.3d at 398; Hague Convention, art. 3. Hazbun has met her burden; the record convincingly confirms that Isidoro was wrongfully retained by Rodriguez within the meaning of the Convention.

■ 5. Although the Convention does not define "habitual residence," the Fourth Circuit has determined that

> there is no real distinction between ordinary residence and habitual residence .... A person can have only one habitual residence. On its face, habitual residence pertains to customary residence prior to the [retention]. The court must look back in time, not forward.[25]

21. Cases brought pursuant to ICARA and the Hague Convention are tried to a judge, as neither ICARA nor the Hague Convention provides for trial by jury and the available remedy—return of the child—is equitable in nature. *See Silverman v. Silverman,* 2002 WL 264932 (D.Minn. Feb.21, 2002).

22. *See* 42 U.S.C. § 11603(e)(2)(A) (requiring proof, by clear and convincing evidence, that one of the defenses set forth in article 13b or 20 of the Hague Convention applies); 42 U.S.C. § 11603(e)(2)(B) (requiring proof, by a preponderance of the evidence, that some other defense set forth in article 12 or 13 of the Hague Convention applies).

23. *See* 42 U.S.C. § 11601(a)(4); *Miller,* 240 F.3d at 402; *Feder v. Evans–Feder,* 63 F.3d 217, 226 (3d Cir.1995); *Rydder v. Rydder,* 49 F.3d 369 (8th Cir.1995).

24. *See also* Hague Convention, art. 13 ("the judicial ... authority *is not bound to order the return* of the child if ...."); Hague Convention, art. 20 ("return of the child under the provisions of Article 12 *may be refused* if ....").

25. *Miller,* 240 F.3d at 400 (citing *Friedrich v. Friedrich,* 983 F.2d 1396, 1401 (6th Cir.1993) (hereinafter *Friedrich I* )).

It is also clear that the parents' citizenship and residence and the child's citizenship are not determinative of the child's habitual residence.[26] The habitual-residence inquiry is fact-specific and should be made on a case-by-case basis. *See Miller*, 240 F.3d at 400. And importantly, a parent cannot create a new habitual residence by wrongfully retaining a child.[27] In cases where a child's initial translocation from an established habitual residence is clearly intended to be of a specific duration (such as a defined visit to see the father during summer vacation), courts have generally refused to find that the changed intentions of one parent can operate to alter the child's habitual residence.[28]

[5] 6. In the instant case, the credible record evidence compels the conclusion that Isidoro was habitually resident in Colombia immediately prior to his retention in the United States. This follows chiefly from the undisputed fact that prior to remaining in the United States in July 2001, Isidoro had lived his entire life in Barranquilla, Colombia. From birth until his parents' separation and divorce, Isidoro lived with his parents in Barranquilla, Colombia. Following his parents' separation in 1996, Isidoro lived with his mother in Barranquilla, attended school there, and had (and continues to have) numerous friends and family in Barranquilla.

■■■ 7. As the custody agreement approved by the Colombian Family Court gave formal custody to Hazbun, with only visitation rights for Rodriguez, it is clear by a preponderance of the evidence that Rodriguez's retention of Isidoro for the last nine to ten months is in violation of Hazbun's custody rights under Colombian law. In this respect, whether a parent was exercising lawful custody of a child at the time of retention must be determined under the law of the child's habitual residence. *Miller*, 240 F.3d at 402; *Friedrich I*, 983 F.2d at 1042. What it means for a parent to exercise custody rights should be construed liberally. As the Sixth Circuit noted,

> The only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.

*Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir.1996) (hereinafter *Friedrich II* ). Thus, the Sixth Circuit concluded, a person with valid custody rights to a child under the law of the country of the child's habitual residence does not fail to exercise those custody rights under the Hague Convention "short of acts that constitute clear and unequivocal abandonment of the child." *Id.* Here, there is not a scintilla of evidence of such abandonment; to the contrary, the record clearly reflects that Hazbun was exercising her lawful custody rights immediately prior to Rodriguez's retention of Isidoro in the United States. She granted permission for Isidoro to *visit* his father in the United States for a brief period; she did not abandon her child, nor did she consent to his retention in the

---

**26.** *See Diorinou v. Mezitis*, 237 F.3d 133 (2nd Cir.2001) (finding that children were habitually resident in Greece where children were citizens of both the United States and Greece, the father was a U.S. citizen, and the mother was a Greek citizen); *March v. Levine*, 249 F.3d 462 (6th Cir.2001) (finding that children were habitually resident in Mexico where the children, both United States citizens, had been living in Mexico with their American father for one year prior to being removed to the United States by their maternal grandparents).

**27.** *See Miller*, 240 F.3d at 400; *Diorinou* 237 F.3d at 141–42.

**28.** *See Mozes v. Mozes*, 239 F.3d 1067, 1077 (9th Cir.2001) (Kozinski, J.) (citing and interpreting cases).

United States. Instead, she has promptly and steadfastly objected to the retention and vigorously pursued steps to compel the child's return to Colombia.

8. In sum, a preponderance of the record evidence convincingly establishes all three elements required under the Convention to prove that Isidoro was wrongfully retained in the United States. Because Rodriguez's retention of Isidoro in the United States was wrongful within the meaning of the Convention, Isidoro's return to Colombia is required under the Convention unless Rodriguez can establish one of the five available defenses.

9. To establish one of the defenses, Rodriguez must prove

(i) by clear and convincing evidence that there is a grave risk that returning Isidoro to Hazbun in Colombia would expose the child to physical or psychological harm or otherwise place him in an intolerable situation;[29]

(ii) by clear and convincing evidence that the return of Isidoro to Colombia would not be permitted by the fundamental principles of the United States "relating to the protection of human rights and fundamental freedoms";[30]

(iii) by a preponderance of the evidence that Hazbun's action for return was not commenced within one year of the wrongful retention *and* that Isidoro is not well-settled in Virginia;[31]

(iv) by a preponderance of the evidence that Hazbun "was not actually exercising the custody rights at the time of … retention … or had consented to or subsequently acquiesced in the … retention";[32] or

(v) by a preponderance of the evidence that Isidoro "objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [his] views."[33]

Rodriguez does not assert or rely on defenses (iii) and (iv).[34] His contentions concerning the remaining defenses are separately addressed.

10. Courts examining the Article 13b exception for grave risk of harm to the child generally look to the risk of physical or psychological harm that might be inflicted on the child by the person to whose custody the child would be returning.[35] This provision of the Convention "was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's

---

**29.** 42 U.S.C. § 11603(e)(2)(A); Hague Convention, art. 13b.

**30.** 42 U.S.C. § 11603(e)(2)(A); Hague Convention, art. 20.

**31.** 42 U.S.C. § 11603(e)(2)(B); Hague Convention art. 12.

**32.** 42 U.S.C. § 11603(e)(2)(B); Hague Convention, art. 13a.

**33.** 42 U.S.C. § 11603(e)(2)(B); Hague Convention, art. 13 ¶ 2.

**34.** The Article 12 exception is inapplicable. Hazbun's Hague Convention petition and this suit were filed well within one year of the

wrongful retention. And, with respect to the Article 13a exception, there is no contention that Hazbun was not exercising her custody rights under the court-approved custody agreement.

**35.** *See, e.g., Miller*, 240 F.3d at 402 (finding no evidence that the mother would pose a danger to her children); *Nunez–Escudero v. Tice–Menley*, 58 F.3d 374 (8th Cir.1995) (finding that allegations that the mother was physically, sexually, and mentally abused by the father and that the mother feared for the safety of the child were too general to establish an exception); *Blondin v. Dubois*, 189 F.3d 240, 247 (2nd Cir.1999) (refusing to return a child to France because she faced a grave risk of physical abuse from her father there).

best interests." *Friedrich II,* 78 F.3d at 1068. Accordingly,

> [o]nly evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination. The person opposing the child's return must show that the risk to the child is grave, not merely serious.

*Id.* No such showing has been made in this case.

■ 11. While there is evidence that American businessmen face a heightened risk of kidnapping and violence and that Rodriguez himself has been threatened, there is no clear and convincing evidence of serious danger in Barranquilla to a thirteen-year old Colombian national who also holds U.S. citizenship and who lives there with his Colombian mother and family. There is no evidence that Isidoro's return would subject him to a *grave* risk of physical or psychological harm or otherwise place him in an intolerable situation. To the contrary, there is evidence that Isido-

ro's family and other relatives live safely in Barranquilla and that Isidoro, on his return, would be able to resume his habitual residence, enjoy his friends and family, and return to the school where he was previously enrolled.

■ 12. Rodriguez's reliance on Article 20 to bar Isidoro's return to Colombia is unpersuasive. The parties have not cited, nor has the Court found, any authority applying the Article 20 exception to return based on "fundamental principles of the [United States] relating to the protection of human rights and fundamental freedoms." This seldom-cited [36] and somewhat obscure provision [37] was adopted as a compromise between those countries that wanted a public policy exception in the Convention and those that did not.[38] It was meant to be "restrictively interpreted and applied ... on the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process." [39] There is no record evidence that approaches this threshold. Thus, Article 20 has no application here.[40]

---

**36.** As of 1997 the Article 20 defense had successfully been invoked only twice internationally—in cases where the constitutionality of the Convention itself was challenged—and not at all in the United States. *See* Report of the Third Special Commission Meeting to Review the Operation of the Hague Convention on the Civil Aspects of International Child Abduction (17–21 March 1997), Permanent Bureau of the Hague Conference on Private International Law ¶ 78 (1997).

**37.** One commentator notes that Article 20 has "nearly faded without a trace." Beaumont, P.R. & McEleavy, P.E., The Hague Convention on International Child Abduction 172 (1999). This may be because Article 20 and Article 13b appear to be redundant. If the return of a child would violate fundamental U.S. principles relating to human rights, it would also involve returning him to an intolerable situation.

**38.** Department of State, Hague International Child Abduction Convention; Text and Legal

Analysis, Pub. Notice 957, 51 Fed.Reg. 10,-494, 10,510 (1986) (hereinafter "State Department Legal Analysis"). This legal analysis of the Hague Convention prepared by the State Department was provided to the Senate Committee on Foreign Relations to assist that Committee and the full Senate in their consideration of the Convention prior to ratification.

**39.** State Department Legal Analysis at 10,510.

**40.** Rodriguez argued that he was denied due process in the Colombian courts when the Barranquilla Family Court decreed the custody arrangement between him and his former wife and later ordered increases in support payments without notice. He also argued that the Barranquilla Family Court did not respect the wishes of Isidoro with respect to custody. These arguments are factually and legally flawed. Article 20 does not contemplate that courts applying the provision must compare the due process safeguards provided

13. The final exception, found in Article 13 ¶ 2, allows a court to decline to return a child when the child objects to being returned and is of sufficient age and maturity such that his views may be considered. This "age and maturity" defense, like the others, is to be narrowly construed. *See England v. England*, 234 F.3d 268, 272 (5th Cir.2000). Both the maturity and the child's objection must be proved by a preponderance of the evidence.[41] The discretionary aspect of this defense is important because of the potential for undue influence by the person who allegedly wrongfully retained the child.[42]

14. Isidoro is a normal child of thirteen who seems to be coping well with an exceptionally difficult situation. Yet, he is certainly not mature nor sophisticated beyond his years, and, like all adolescents, he is susceptible to suggestion and manipulation. Indeed, some of his statements regarding reasons for staying in the United States appear to be the product of suggestion, echoing the preferences of his father. Isidoro does not have a strong objection to returning to Colombia, as he has little or no fear for his personal safety and has no objection to living with his mother. His stated preference is to re-

main in the United States for now to spend more time with his father, but then to spend equal time in the United States and Colombia. To accommodate Isidoro's preference would be a custody determination that is not at issue in a Hague Convention petition. Because Isidoro is not exceptionally mature and does not object strongly to returning to Colombia, the Article 13 ¶ 2 exception has not been established.

15. Under these circumstances, where Isidoro has been wrongfully retained in the United States and none of the available exceptions have been established, ICARA and the Hague Convention require Isidoro's return to Colombia "forthwith."[43] An appropriate order will issue.

in the petitioner's country with those provided in the respondent's country or with some ideal notion of due process. *See* State Department Legal Analysis at 10,511. Further, the facts disclose no violations of Rodriguez's or Isidoro's due process rights in connection with the custody determination, which is reflected in the court-approved agreement. That Rodriguez may have been denied notice and opportunity for a hearing with respect to later orders for increases in child support has no bearing on a determination under the Hague Convention whether the child's return would violate fundamental principles of the United States relating to the protection of human rights and fundamental freedoms.

**41.** *See England* 234 F.3d at 273 (reversing a district court and finding that a 13–year old who had four mothers in twelve years, had

been diagnosed with Attention Deficit Disorder, had learning disabilities, took Ritalin regularly, and was scared and confused by the circumstances producing the litigation was not sufficiently mature to meet the standard—but, significantly, *not* finding that a 13–year old is not sufficiently mature as a matter of law).

**42.** *See* Pub. Notice 957, 51 Fed.Reg. 10,494, 10,509 (1986) ("As with the other Article 13 exceptions to the return obligation, the application of this exception is not mandatory.... A child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child.").

**43.** Hague Convention art. 12.