ALDISERT, Circuit Judge,
dissenting.
My colleagues conclude that the Hague Convention and the International Child Abduction Remedies Act (ICARA), 42 U.S.C. §§ 11601-11610, divest this Court of its elemental power to deny relief to a litigant with “unclean hands” relative to the equitable remedy sought. I disagree, as I cannot accept that the Convention sub silentio undermines our power — and indeed, our obligation — to deny equitable re *267 lief to a petitioner who has engaged in unconscionable conduct directly bearing on the dispute between the parties. Accordingly, I would raise the unclean-hands doctrine sua sponte to dismiss Karpenko’s petition based on her unscrupulous actions in willfully 'violating the custody orders of Pennsylvania courts, abusing Pennsylvania’s legal processes, absconding with the parties’ daughter, E.L., and denying E.L. all access to Leendertz, her father, since 2006. Because this unconscionable misconduct relates directly to Karpenko’s claim for return of a child under the Hague Convention, it operates as a complete bar to her relief. Respectfully, I dissent.
I.
Both the Hague Convention and its available remedy — the return of a child— are equitable in nature. See Hazbun Escaf v. Rodriquez, 200 F.Supp.2d 603, 611 n. 21 (E.D.Va.2002).[1] As with other equitable remedies, therefore, Hague relief is subject to the equitable doctrine that “he who comes into equity must come with clean hands.” Precision Instr. Mfg. Co. v. Aut. Maint. Mach. Co., 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) (quotation marks omitted). The doctrine of unclean hands is “a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.” Id. Courts close their doors “only for such violations of conscience as in some measure affect the equitable relations between the parties [relative to the relief sought].” Highmark, Inc. v. UPMC Health Plan, 276 F.3d 160, 174 (3d Cir.2001) (quotation omitted). As we have often emphasized, the nexus “between the misconduct and the claim must be close.” E.g., In re New Valley Corp., 181 F.3d 517, 525 (3d Cir. 1999).
Although the doctrine of unclean hands is frequently interposed as an equitable defense, we may raise the doctrine sua sponte, see Highmark, 276 F.3d at 174, to ensure that our equitable powers are “never ... exerted in behalf of one who has acted fraudulently or who by deceit or any unfair means has gained an advantage,” Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933). As we have explained previously,
the equitable doctrine of unclean hands is not a matter of defense to the defendant. Rather, in applying it[,] courts are concerned primarily with their own integrity, and with avoiding becoming the abettor of iniquity.
Ne. Women’s Ctr., Inc. v. McMonagle, 868 F.2d 1342, 1354 (3d Cir.1989) (citations and quotations omitted). Consequently, it is our prerogative, and even our obligation, to shut this Federal Court’s doors “in li-mine” to a remedy-seeker who has committed “some unconscionable act [with an] immediate and necessary relation to the equity that he seeks.” Keystone, 290 U.S. at 245, 54 S.Ct. 146.
Contrary to the majority’s conclusion, the doctrine of unclean hands is fully applicable to litigation under the Hague Convention. Although the majority is correct that the unclean-hands doctrine is not among the Convention’s enumerated exceptions, I presume that “Congress is knowledgeable about existing law pertinent to the legislation it enacts,” Goodyear *268 Atomic Corp. v. Miller, 486 U.S. 174, 185, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988), including the doctrines of equitable tolling and fugitive disentitlement, as well as the unclean-hands doctrine, applicable to suitors seeking equitable relief. Consequently, I do not share the majority’s difficulty in locating “any authority that would support dismissal of a Hague Convention petition on grounds of unclean hands.” Maj. Op. at 266. The long arm of equity is present here. Indeed, the equitable nature of the Convention’s remedy renders the unclean-hands doctrine fully applicable in Convention cases. Nothing in ICARA or the Convention specifies otherwise. That is all the “authority” I require.[2]
The majority is mistaken in assuming that Hague litigation is immune from traditional equitable doctrines. In Journe v. Journe, 911 F.Supp. 43 (D.P.R.1995), a district court invoked its “equitable powers” and the doctrine of waiver to dismiss Dr. Journe’s petition for the return of his children under the Hague Convention. Id. at 47-48. After his wife removed his children from France to Puerto Rico, Dr. Journe voluntarily dismissed his divorce and custody proceedings in French court. Id. at 48. In view of those facts, the court held that Dr. Journe “waived” his Hague remedy by “eschew[ing][his] opportunity to resolve the custody dispute in his native France.” Id. In the court’s view, Dr. Journes’s conduct evinced “an intent to relinquish his rights to have the custody issues decided by the courts of France.” Id. Significantly, the court’s waiver analysis afforded no special solicitude for Hague Convention claims. See id.
Courts have similarly invoked their equitable powers to deny Hague relief under the fugitive disentitlement doctrine. In Prevot v. Prevot, 59 F.3d 556 (6th Cir. 1995), the Court of Appeals for the Sixth Circuit applied the doctrine to reverse the district court’s grant of the Hague petition of Mr. Prevot, a fugitive from the United States. Id. at 566-567. In the court’s view, “nothing in the [Hague] Convention or [ICARA] ... purports to strip an American court of the powers inherent to it as a court,” including the powers to “react to abuses of American criminal process, to defiance of judicially-imposed obligations owed to victims of crime, and to flights from financial responsibilities to our government.” Id. at 566. Other courts have followed suit. See Pesin v. Rodriguez, 244 F.3d 1250, 1253 (11th Cir.2001) (applying the doctrine to dismiss the fugitive mother’s appeal from the district court’s order granting the father’s Hague petition, reasoning that “[w]e cannot permit [her] to reap the benefits of a judicial system the orders of which she has continued to flaunt”); Sasson v. Shenhar, 276 Va. 611, 667 S.E.2d 555, 564 (2008) (affirming the appellate court’s dismissal of the father’s Hague appeal on fugitive disen-titlement grounds). Additionally, those courts that have declined to apply the dis-entitlement doctrine have done so based on specific factual circumstances, and have not determined the doctrine to be categorically inapplicable to claims of wrongful removal under the Hague Convention.[3] In *269 my view, these cases demonstrate that Hague litigation is subject to the full range of nonstatutory equitable doctrines applicable in other controversies. As indicated, because the return-of-child remedy is essentially equitable, a Hague petition is subject to equity’s doctrine of unclean hands.
The majority finds the unclean-hands doctrine inapplicable in Hague litigation because it “would undermine the Hague Convention’s goal of protecting the well-being of the child, of restoring the status quo before the child’s abduction, and of ensuring ‘that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.’ ” Maj. Op. at 265 (quoting Hague Convention, art. 1(b)). But that argument proves too much. When we apply equitable doctrines to deny a remedy to which a claimant is otherwise entitled, we necessarily subordinate the substantive law to our Court’s obligation to defend our jurisprudential reputation and integrity. Cases under the Hague Convention have been no exception. Thus, when courts have applied the fugitive dis-entitlement doctrine to Hague matters, they have subordinated Hague policies to deter “abuses of American criminal process,” Prevot, 59 F.3d at 566, “promot[e] the efficient operation of the courts, dis-eourag[e] flights from justice, and avoid[ ] prejudice to the other side caused by the appellant’s fugitive status,” Pesin, 244 F.3d at 1253. Likewise, at least one court has subordinated Hague policies to the policies underlying the doctrine of waiver. See Joume, 911 F.Supp. at 48. Unless the majority is prepared to exempt Hague litigation from the doctrines of both waiver and fugitive disentitlement, it lacks a principled basis for refusing to apply the unclean-hands doctrine on the ground that it “undermine[s]” Hague objectives. See Maj. Op. at 265.
The majority states that “fugitive disen-titlement does not apply to Karpenko’s conduct here,” Maj. Op. at 265 n. 5, but offers no justification for distinguishing between the equitable doctrines of fugitive disentitlement and unclean hands. I readily concede that the unclean-hands doctrine is inapplicable to some categories of lawsuits, as when litigants represent the public interest, e.g., Perma Life Mufflers v. Int’l Parts Corp., 392 U.S. 134, 138-139, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) (pari delicto defense unavailable in private antitrust cases because they “serve[] important public purposes”), or act as private attorneys general, e.g., ASPCA v. Ringling Bros. & Barnum & Bailey Circus, 244 F.R.D. 49, 53 (D.D.C.2007) (unclean-hands defense unavailable in litigation under the Endangered Species Act because private litigants further “the overriding public policy in favor of protecting the animals”). But the rationale foreclosing the unclean-hands doctrine in those cases — that unclean hands should not bar a litigant from achieving a broad public benefit — -is absent in individual cases under the Hague Convention. Nor can the majority’s position be justified by reference to the magnitude of the rights implicated in Hague litigation. See Walsh v. Walsh, 221 F.3d 204, 216 (1st Cir.2000) (“To bar a parent who has lost a child from even arguing that the child was wrongfully removed to another country is too harsh.”). In my view, that magnitude heightens our profound obligation to ensure that this Court does not become an instrumentality of iniquity in relation to those rights.[4]
*270 The majority is also concerned that application of the unclean-hands doctrine would be commonplace in Hague Convention matters, because wrongful removal “is most likely to occur when strained relations between parents are at their worst” and after “one or both parents may [have] interfere[d] with the other’s custody rights.” Maj. Op. at 265. They fear that the unclean-hands doctrine will eviscerate the Hague Convention’s “remedy [for] preventing] a cycle of abduction and re-abduction, an outcome which would inflict needless harm on vulnerable children.” Maj. Op. at 266. But that argument assumes that we would apply the doctrine woodenly, without sensitivity to the acrimonious factual circumstances frequently attending Hague petition cases. Here, I heed the Supreme Court’s admonition, in the fugitive disentitlement context, that courts must exercise “restraint,” denying relief only as a “reasonable response to the problems and needs that provoke it.” Degen, 517 U.S. at 828-824, 116 S.Ct. 1777. Applying that teaching, I would not deny Hague relief as a matter of course whenever one parent has done something to “interfere with the other’s custody rights,” Maj. Op. at 265, as I agree that this may be relatively commonplace in heated custody battles. I accept that the unclean-hands doctrine must be applied with restraint, but I insist that it must be applied. Unless the Supreme Court instructs otherwise, I refuse to interpret the Hague Convention to afford unconditional relief to a litigant whose exceptional, inequitable, and reprehensible misconduct is a direct, but-for cause of the unlawful removal of which she complains.
The majority contends finally that, even if the Hague Convention is subject to the doctrine of unclean hands, it inappropriate in this case because “Leendertz engaged in precisely the type of conduct that the Hague Convention was designed to deter.” Maj. Op. at 266. As a factual matter, I disagree. The majority acknowledges, but downplays, the fact that Leendertz removed his daughter to the United States in reliance on an order from a Pennsylvania court that purported to authorize him to “obtain custody of the child at any place that she may be found, [including “at her school,”] whether in the United States or any other country.” App. 445-447. Significantly, it additionally specified that “[n]o further proceedings or any further orders shall be required for Father to obtain custody of the child.” App. 445-447. Although the Pennsylvania court may have lacked the authority to enter an order with such a huge sweep, that order doubtless made this case of unlawful removal an exceptional one. Here, Leen-dertz did not eschew legitimate legal processes for self-help; he did not remove his child to the United States because he was unwilling or unable to obtain judicial relief. Indeed, given Leendertz’s multi-year effort to gain access to his daughter through the court system, I doubt he would have removed the child to the United States but-for the Pennsylvania court’s order purporting to authorize his actions. I am aware of no other case in which a Hague respondent effected an unlawful removal that was purportedly authorized by an American court. Under these circumstances, I conclude that Leendertz’s conduct was qualitatively different from that *271 which “Hague Convention was designed to deter,” Maj. Op. at 266, and I find the Convention’s deterrence rationale completely inapplicable in this case.
In sum, I would hold that the doctrine of unclean hands is fully applicable in Hague Convention cases, as “[p]ublic policy ... makes it obligatory for courts to deny a plaintiff relief once his ‘unclean hands’ are established.” Gaudiosi, 269 F.2d at 882. Although I recognize that we must measure “unconscionable conduct” with sensitivity to the factual peculiarities of Hague cases, I would not except Hague litigation from this longstanding principle. I now turn to the application of these precepts to the uncontroverted facts of this case.
II.
The equitable doctrine of unclean hands applies when a party seeking relief has committed an “unconscionable” act that is “immediately related to the equity the party seeks in respect to the litigation.” Highmark, 276 F.3d at 174. Additionally, the nexus “ ‘between the misconduct and the claim must be close.’ ” Id. (quoting New Valley, 181 F.3d at 525). I would hold that Karpenko’s conduct in this case was both unconscionable and directly related to her petition for the equitable remedy of return of a child under the Hague Convention. Accordingly, I would reverse the District Court and remand for the entry of an order dismissing her petition.
In September 2002, Leendertz and Kar-penko entered a stipulation in which they agreed that Karpenko would have primary physical custody of the child in the Ukraine, subject to Leendertz’s right to visit the child four times per year, for a total of thirteen weeks. Karpenko v. Leendertz, No. 09-03207, 2010 WL 831269, at *1 (E.D.Pa. Mar. 4, 2010) (District Court’s Return Order & Opinion); see App. 265-267 (stipulation). The stipulation was entered as an Order of the Court by a judge of the Pennsylvania Court of Common Pleas. Karpenko, 2010 WL 831269, at *1. As agreed, Karpenko thereafter moved with the child to the Ukraine. Id. In May 2003, she relocated to the Netherlands, apparently at Leendertz’s request. Id.
Since 2006, Karpenko has unconscionably denied Leendertz all access to the child, in complete violation of the parties’ 2002 agreement and the laws of both the United States and Holland. See id. at *2. Additionally, when Karpenko moved with the child to a new address in the Netherlands in 2007, she did not provide Leen-dertz with her new address or telephone number. Id. In numerous telephone messages, Karpenko has threatened Leendertz that he will never see E.L. again and has warned him that, if he tries to see her, Karpenko will change the child’s name and get her a new passport. Id. Other evidence indicated that Karpenko maligned Leendertz and denied the child access even to Leendertz’s relatives in the Netherlands. See App. 455. In my view this conduct is malicious and unconscionable; it goes far beyond a simple “interfere[nce] with [Leendertz’s] custody rights.” Maj. Op. at 265.
Karpenko also behaved unconscionably in disregarding the custody orders of Pennsylvania courts and manipulating those courts to her advantage. Not insignificantly, Karpenko first obtained the right to leave the United States with E.L. via the September 2002 order of the Pennsylvania Court of Common Pleas. See Karpenko, 2010 WL 831269, at *1-2. To obtain that right, Karpenko pledged that Leendertz would have rights of visitation and access and promised not to challenge the custody agreement. Id.) App. 266-267. That pledge proved entirely specious, however, as Karpenko went on to disre *272 gard each of her court-ordered obligations once she departed the United States. Karpenko first disregarded the court’s order with respect to Leendertz’s visitation rights; by 2006, she was determined to deny him any and all access to the child. See Karpenko, 2010 WL 831269, at *2. Then, in February 2008, she petitioned a Dutch court for sole custody of E.L., this time disregarding the Pennsylvania court’s order insofar as it bound her not to challenge the parties’ September 2002 agreement. See id. On May 23, 2008, Leen-dertz filed petitions in Pennsylvania court for Modification of a Custody Order and for Civil Contempt. Id. Karpenko sought a continuance of those proceedings, and in exchange for that continuance, Karpenko promised the court that she would permit Leendertz to visit with the child pending the full hearing. See App. 336, 405. Pursuant to that promise, the court entered an order granting Leendertz partial physical custody in the Netherlands during the week of October 26 to November 30, 2008. App. 429. But Karpenko’s promise was yet another subterfuge; predictably, she defied the court and refused to permit Leendertz to visit with his daughter. App. 452. In view of those circumstances, a Pennsylvania court entered a contempt order against Karpenko on May 20, 2009. Karpenko, 2010 WL 831269, at *2; App. 448-456. That court additionally awarded Leendertz full custody over E.L. and authorized him to “obtain custody ... at any place that she may be found.” Karpenko, 2010 WL 831269, at *2; App. 446.
When the District Court granted Kar-penko’s Petition for Return of Child, she very nearly succeeded in making the federal court system an “abettor” of her inequitable conduct. See Ne. Women’s Ctr., 868 F.2d at 1354. As the District Court granted Karpenko’s Hague petition, it observed, but apparently minimized, Karpen-ko’s complete lack of credibility throughout the proceedings. Karpenko, 2010 WL 831269, at *3. Nevertheless, the District Court’s subsequent Stay Order memorialized its distrust of the litigant who had achieved success on the merits of her Hague claim. In that order, the District Court assumed Karpenko would defy almost any court order adverse to her, emphasizing its “concern[] that the Mother [would] not comply with an Order from the Third Circuit ordering the child’s return to the United States.” Karpenko v. Leendertz, 2010 WL 996465, at :,!2 (E.D.Pa. Mar.15, 2010) (District Court’s Stay Order). To circumvent an adverse order, the Court predicted that “[t]he Mother may ... flee with the child to an unknown location in Europe and change the child’s name, as she has threatened to do in the past.” Id. In my view, Karpenko’s inequitable conduct toward Leendertz thus continued as she invoked the District Court’s power against him, while making it clear that she did not consider herself to be bound by its orders. Unlike my colleagues, I would not permit her to employ the power of the federal courts in this abusive manner. Additionally, in view of Karpen-ko’s evident disdain for American courts, I believe it is only fitting to deny her “the benefits of a judicial system the orders of which she has continued to flaunt,” Pesin, 244 F.3d at 1253, just as we do in fugitive disentitlement cases.
Karpenko’s petition under the Hague Convention is but her latest effort to make American courts the instrumentalities of her inequitable conduct. In my view, we are duty-bound to deny Karpenko all equitable relief in view of her unconscionable and fraudulent conduct — her manipulation of the American legal process, her defiance of court orders, and her unrelenting iniquity toward Leendertz. It is plain that Kar-penko seeks equity in this Court after she “gained an advantage” by “act[ing] fraudu *273 lently, [by] deceit, [and by] unfair means. Keystone, 290 U.S. at 244-245, 54 S.Ct. 146. I would hold that Karpenko’s unclean hands bar us from hearing her case, much less granting her requested relief. Accordingly, I would remand these proceedings to the District Court for entry of an order dismissing Karpenko’s petition. For the reasons heretofore stated, I respectfully dissent.

. See also, e.g., Bell v. Aerodex, Inc., 473 F.2d 869, 872 (5th Cir.1973) ("[T]he remedy sought ... dictate[s] whether the case will be considered an action at law or a proceeding in equity.”).

. See also Prevot v. Prevot, 59 F.3d 556, 566 (6th Cir.1995) (leaving open the question whether “unclean hands” may be asserted as a “defense” or exception in a case under the Hague Convention).

. See March v. Levine, 249 F.3d 462, 470 (6th Cir.2001) (observing that "[g]iven the fundamental rights at issue, ... disentitlement will generally be too harsh a sanction in a case involving an ICARA petition,” and declining to disentitle the petitioner based on civil contempt orders unrelated to the parties' Hague dispute); Walsh v. Walsh, 221 F.3d 204, 216 (1st Cir.2000) (holding that dismissal under the fugitive disentitlement doctrine would be "too harsh[,] particularly in the absence of *269 any showing that the fugitive status has impaired the rights of the other parent”).

. Through the ages, great writers and dramatists have sounded the call for the intervention of relief now reflected by modern day equity *270 precepts. “Rigorous law is often rigorous injustice,” wrote the Roman playwright Terence (185-159 B.C.) in Heautontimorumenos act. iv, sc. 5,1. 48. Years later Cicero (106-45 B.C.) wrote that " 'extreme law, extreme injustice’ is now become a stale proverb in discourse.” I. De Officiis, ch.10. This aphorism echoed in Jean Racine’s 1664 observation that “extreme justice is often injustice.” Freres Ennemies, act iv. sc. 3. Then came Voltaire in 1718: "Mais 1'extreme justice est une extreme injure.” Oedipus, act iii, sc. 3.